222 N.J. Super. 36 (1987)
535 A.2d 986
DONNA M. WHITFIELD, PLAINTIFF-APPELLANT, CROSS-RESPONDENT,
v.
PERRY N. WHITFIELD, DEFENDANT-RESPONDENT, CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued February 10, 1987.
Decided December 18, 1987.
*38 Before Judges BRODY, LONG and D'ANNUNZIO.
Alan M. Grosman argued the cause for appellant-cross-respondent (Grosman and Grosman, attorneys).
Noranne Stradley argued the cause for respondent-cross-appellant.
Rosemary J. Dempsey argued the cause for amicus curiae NOW Legal Defense and Education Fund, Women's Legal Defense Fund, American Association of Retired Persons, Ex-partners of Servicemen/Women for Equality, National Action for Former Military Wives, National Organization for Women of New Jersey, Older Women's League, Pension Rights Center, and Women's Equity Action League (Judith I. Avner and Sally F. Goldfarb, on the brief).
The opinion of the court was delivered by LONG, J.A.D.
*39 The issue before us is whether that portion of a pension which was earned during coverture but which is neither vested nor matured is subject to equitable distribution upon divorce. We hold that such a pension is "property" acquired during the course of the marriage within the meaning of N.J.S.A. 2A:34-23 and that the practical difficulties inherent in its valuation in no way affect its includability in the marital estate. In so doing we part company from prior decisions of this court which have concluded otherwise. Barba v. Barba, 198 N.J. Super. 205 (App.Div. 1985); White v. White, 136 N.J. Super. 552 (App.Div. 1975).
Plaintiff, Donna M. Whitfield, and defendant, Perry N. Whitfield, were married in 1968. Five months later, defendant entered the United States Air Force in which he is presently serving. Because of defendant's military status, the family moved every three years and lived all over the world. Defendant was absent from home frequently, and according to plaintiff, who spent her married life as a homemaker, she was "mother (to the three children born of the marriage) father, housekeeper, everything. My husband was gone most of the time and I took care of everything." In 1984 the parties began experiencing marital problems and after 16 years of marriage, separated. Thereafter, plaintiff instituted these proceedings.
Prior to trial, a settlement was reached leaving several issues in dispute including the question of whether any portion of defendant's military pension should be distributed to the plaintiff. Pursuant to 10 U.S.C. § 8911, defendant began to accumulate time credits toward a military pension when he entered the Air Force. To be eligible to receive pension benefits an individual in the Air Force must spend twenty years or more in active service. This type of pension plan operates under a system of "cliff vesting" which requires the participant to complete the required number of years in service in order to receive a pension. Such a pension vests (becomes an absolute *40 entitlement) and matures (is collectible) simultaneously. Any number of years of service short of the required amount entitles the participant to nothing.
While the parties lived together defendant served 16 of the 20 years necessary to receive his pension. He will complete 20 years of service on November 26, 1988. Under the basic formula for computing military retirement pay contained in 10 U.S.C. § 3991, if defendant, who has reached the rank of Major, receives no raise in monthly base pay above the $2,864 per month he is currently receiving, as of 1988 he will be entitled to receive a pension of $17,244 per year until his death.
In an oral decision after trial, the trial judge concluded that defendant's pension rights were not includable assets in the marital estate because they were not "vested." Plaintiff here challenges this determination.
In 1971, in its first revision of the divorce laws in over half a century, the Legislature acknowledged the equal contribution of husband and wife to a marital relationship and directed courts to "effectuate an equitable distribution of the property, both real and personal, which was legally and beneficially acquired" during the course of the marriage upon its dissolution. N.J.S.A. 2A:34-23. Broad social policy considerations underpinned the act:
[T]he enactment [of the equitable distribution statute] seeks to right what many have felt to be a grave wrong. It gives recognition to the essential supportive role played by the wife in the home, acknowledging that as a homemaker, wife and mother she should clearly be entitled to a share of family assets accumulated during the marriage. Thus the division of property upon divorce is responsive to the concept that marriage is a shared enterprise, a joint undertaking, that in many ways it is akin to a partnership. [Rothman v. Rothman, 65 N.J. 219, 229 (1974)]
In general, realization of the legislative goal embodied in the equitable distribution statute has proceeded smoothly. The one exception has been the subject of pensions which has proved a thorny problem. Indeed, after the enactment of the statute in 1971, it was argued that pensions are not marital "property" at all. Although in Painter v. Painter, 65 N.J. 196 (1974), the *41 Supreme Court sweepingly defined the term property to include anything attributable directly or indirectly to the expenditure of effort by either spouse,[1] litigants continued to adhere to the notion that their pensions, unlike other marital assets, were personal to them and not subject to being shared with a divorcing spouse.
To some extent this approach was institutionalized by courts which, from the beginning, accorded differential treatment to pensions vis-a-vis run of the mill marital assets such as real estate, jewelry, bank accounts and securities which were distributed with relative ease. The judicial perspective on pensions has been colored by several factors. The most significant are that pensions, unlike most other marital assets, are intangible and difficult to value and that the myriad of variations in pension structures evades the formulation of a simple rule of includability. Coupled with litigants' intransigent attitudes on the subject, these factors led courts to accept, without critical analysis, theories barring the includability of pensions and set the stage for the long struggle toward equity in the distribution of pensions which followed.
It was not until 1975 that the first case declaring a pension theoretically includable for distribution purposes was decided by an appellate court. Pellegrino v. Pellegrino, 134 N.J. Super. 512 (App.Div. 1975). To be sure, the approach adopted in that case was primitive considering that it declared only the pensioner's contributions to the plan as marital property; the pensioner alone enjoyed the employer's contributions. Nonetheless, Pellegrino enunciated the general principle of pension includability, an issue which the Supreme Court did not have occasion to lay to rest for two more years. Kruger v. Kruger, 73 N.J. 464 (1977). Kruger was expected to establish an angle of repose for the issue of pension distribution, but this did not *42 happen. Courts continued to be troubled by the uncertainities connected with future pension benefits. In essence, any contingency to the receipt of benefits was viewed as barring distribution and "vesting" emerged as the bright line test for includability. White v. White, 136 N.J. Super. 552 (App.Div. 1975); Mueller v. Mueller, 166 N.J. Super. 557 (Ch.Div. 1979); But see Weir v. Weir, 173 N.J. Super. 130 (Ch.Div. 1980).
This occurred notwithstanding that in Stern v. Stern, 66 N.J. 340 (1975), the Supreme Court had already signaled the inapplicability of vesting as an equitable distribution standard:
Finally, it is urged that the accounts receivable should be excluded from consideration because they are not a property interest that has "vested" in the defendant. What we have already said would seem an adequate answer to this argument. We take the opportunity, however, to suggest that the concept of vesting should probably find no significant place in the developing law of equitable distribution. The notion of a vested interest came into being in a feudal society and was intimately associated with the medieval concept of seisin. Holdsworth, An Historical Introduction to the Land Law, (1927) 68; Jenks, A Short History of English Law, (4th ed. 1928) 84-5. It has played an important part in the development of the law of future interests, and early assumed a crucial role in the portion of the law dealing with the rule against perpetuities. On the other hand and in a quite different context the phrase, "vested rights," is occasionally used to denote something to which constitutional guaranties may apply. 1 Simes and Smith, The Law of Future Interests (2nd ed. 1956) sec. 130, 116-18; Rothman v. Rothman, 65 N.J. 219, 225 (1974). These now customary usages of the concept of vesting are clearly in no way relevant to the question of effecting an equitable distribution upon the occasion of a divorce. Our statute requires, in order that property be available for distribution incident to a divorce, that it shall have been acquired during marriage. There is no reference to vesting. With only this brief word upon the subject, which is not really before us, we leave for another day any further discussion of the important and possibly difficult question as to what future interests may qualify as "property" within the meaning of N.J.S.A. 2A:34-23. [66 N.J. at 348-349 (emphasis in original)]
In spite of this language, vesting continued to be invoked as a requirement for the includability of a pension in the marital estate with the effect that divorcing spouses were denied a share in future pension benefits solely because of the possibility that they might not be received. Those pensions which were received after the divorce were enjoyed by the pensioner alone.
*43 In McGrew v. McGrew, 151 N.J. Super. 515 (App.Div. 1977), we addressed the inequity presented by this approach and rejected the view that any contingency would defeat a spouse's claim.[2] Following the Supreme Court's cue in Stern, we said that:
While the uncertainty of enjoying benefits may be a factor to be considered in awarding distribution, the failure of the property interest to have vested in the sense essential to the alienability of real estate does not disqualify it as property acquired during the marriage for purposes of equitable distribution. [McGrew, supra, 151 N.J. Super. at 518]
Positing the critical question in this kind of an analysis to be the nature of the interest and how it was earned, we went on to conclude that:
Although some question exists as to when or whether the retirement benefits will be enjoyed, the consideration critical to the issue of distribution is the extent to which the anticipated benefits will have been generated by the mutual effort of the parties. [Id.]
Thereafter in 1981, in Kikkert v. Kikkert, 177 N.J. Super. 471 (App.Div. 1981), aff'd o.b. 88 N.J. 4 (1981), a case which addressed a vested but unmatured pension, the Supreme Court approved the approach we took in McGrew and set forth the analytical framework for the resolution of all pension distribution questions:
The critical task is to properly interpret the phrase "legally and beneficially acquired." We have been instructed to employ a "comprehensive" definition and include such property as "is the direct or indirect result of an expenditure of effort on the part of the spouse, ...." Painter v. Painter, 65 N.J. 196, 215, 217 (1974). It was therefore concluded that "all property, regardless of its source, in which a spouse acquires an interest during the marriage shall be eligible for distribution in the event of divorce (footnote omitted)." Id. at 217. "[T]he concept of vesting should probably find no significant place in the developing law of equitable distribution ... These now customary usages of the concept of vesting are in no way relevant to the question of effecting an equitable distribution...." Stern v. Stern, 66 N.J. 340, 348 (1975). Our inquiry should more properly focus on whether rights or benefits were "acquired" by the parties or either of them during the marriage, rather than on whether they were "vested." Ibid; Pellegrino v. Pellegrino, 134 N.J. Super. 512, 515-516 (App.Div. 1975). See Scherzer v. Scherzer, 136 N.J. Super. 397, *44 401-402 (App.Div. 1975), certif. den. 69 N.J. 391 (1976). [Kikkert, supra, 177 N.J. Super. at 474-475]
Identifying pension rights as an important marital asset, Kikkert clearly rejected vesting as a relevant consideration in an equitable distribution analysis and refocused the inquiry on the statutory criteria of acquisition: whether the pension was acquired during the marriage.
Yet in 1985, this court decided Barba v. Barba, supra, which was relied on by the trial judge to exclude defendant's pension from the marital estate. Barba inexplicably concluded that an unvested pension is not distributable
in the light of our established case law and, of equal importance, because of the potential problems arising from including as a distributable asset an interest which is so contingent as not to be subject to an acceptable statistical valuation, or from enforcing a long term sharing of financial interests despite the changed relationships and circumstances of the parties. [Barba, supra, 198 N.J. Super. at 212]
By relying on White v. White, supra, which predated McGrew and Kikkert, Barba gave currency to an analysis which the Supreme Court had already rejected. More importantly, Barba misread Kikkert as holding that only a vested pension is includable for distribution. What Kikkert actually held was that a pension which happens to be vested is not excluded from distribution simply because it has not yet matured. These are entirely different concepts. The former is an incorrect principle based on the viability of the vesting standard which Kikkert did not endorse. The latter reaffirms the principle we enunciated in McGrew: the mere existence of a contingency to the receipt of pension benefits is not a bar to includability. But Barba's most crucial error was that it failed to heed the Supreme Court's direction in Kikkert to analyze the includability issue from the statutory perspective of when and how the pension was earned or acquired. In light of the rather clear language of Kikkert, we view Barba as an anomaly in the developing law of equitable distribution, and we disagree with it.
The touchstone of this inquiry is not whether defendant's pension interest was vested at the time of the divorce but *45 whether that interest constitutes property acquired during the marriage. In McGrew and Kikkert, we recognized a pension plan as a form of deferred compensation for services rendered. As a substitute for wages such benefits unquestionably constitute property.
Concededly, there is an element of uncertainty connected with this pension insofar as defendant must continue to work until 1988 in order to receive it. In our estimation, this uncertainty has been the source of the analytical error on the part of the courts which have characterized a nonvested pension as a "mere expectancy." See White v. White, supra. 136 N.J. Super. at 554, citing Williamson v. Williamson, 203 Cal. App.2d 8, 11, 21 Cal. Rptr. 164, 167 (1962). In fact, a nonvested pension is a far cry from an entirely speculative "mere expectancy," the nature of which would not justify inclusion in the marital estate. See Mahoney v. Mahoney, 91 N.J. 488 (1982). An expectancy
describes the interest of a person who merely foresees that he might receive a future beneficence, such as the interest of an heir apparent [citations omitted], or of a beneficiary designated by a living insured who has a right to change the beneficiary [citations omitted]. As these examples demonstrate, the defining characteristic of an expectancy is that its holder has no enforceable right to his beneficence. [In re Marriage of Brown, supra, 15 Cal.3d 838, 845, 544 P.2d 561, 565, 126 Cal. Rptr. 633, 637 (1976) (emphasis in original).]
Unlike an expectancy, accession to which comes entirely by chance, the employee has some control over receipt of a non-vested pension. To be sure, the control is not absolute because the employee may be terminated or the business may close. However, if the employee continues to work for the required number of years, he will be legally entitled to his pension. This is what distinguishes a non-vested pension from a mere expectancy. Such a pension is property in the form of a contract right to deferred compensation subject only to the fulfillment of the condition of the requisite number of years of employment by the employee.
Defendant claims that this pension will not be "earned" until the 20th anniversary of his entry into the service and that that *46 will be the day it was "acquired" for includability purposes. If we were to accept this superficial analysis as a bar to the inclusion of this significant asset in the marital estate, we would be paying lip service to the theory of equitable distribution while ignoring the reality before us. These parties were married for sixteen years during which time they experienced all of the joys and sorrows of married life. They raised three children. It is uncontroverted that they labored, shoulder to shoulder in the military, establishing homes and supporting their family, both financially and emotionally, all over the world. During the entire marriage, defendant was accumulating credits toward his pension which both parties anticipated he would receive in 1988. Clearly, this pension will not be earned on the 20th anniversary of defendant's entry into the service. Rather, it was earned during each and every day of his 20 years of employment in the military, 16 years of which were spent in a "shared enterprise" with plaintiff. Rothman v. Rothman, supra, 65 N.J. at 229; Kikkert, supra, 88 N.J. at 10 (Pashman, J., concurring). Both of these parties contributed to the earning of defendant's pension rights by their participation in the marriage, and both justifiably expected to share the future enjoyment of the pension benefits which represent a significant part of the marital estate:
The important expectations attached to this asset by both husband and wife cannot be overstated. They involve, after all, the fundamental belief by both spouses that their mutual security in later years will be protected by pension benefits. They also involve an assumption of interdependence and wealth-sharing that has almost certainly been held jointly by both husband and wife during their years of marriage. [Bonavich, "Allocation of Private Pension Benefits as Property in Illinois Divorce Proceedings," 29 DePaul L.Rev. 1, 16 (1979)]
What defendant's contention boils down to is that this property, which was acquired by the joint efforts of the parties, should be excluded from the distributable estate solely because of the fortuitous timing of the failure of this marriage. Indeed, if the parties had held out for four more years, the 16 years of pension credits at issue here would have been included in the marital estate without question. A similar result would have *47 occurred if the sixteen years during which these parties were married fell at the end of the 20 year period of pension credits instead of the beginning. This is the fallacy in defendant's claim. The includability of property in the marital estate does not depend on when, during the marriage, the acquisition took place. It depends solely on the nature of the interest and how it was earned.
This is not to say that the conditional nature of a nonvested pension is an entirely inconsequential consideration in an equitable distribution analysis. It is irrelevant on the preliminary includability question; a nonvested pension does not differ at all from a vested pension in terms of its nature as acquired property. Beyond the question of includability however, the conditional nature of a nonvested pension is clearly a legitimate area of inquiry on issues of valuation and distribution. For it is true that pensions which are neither vested nor matured are more difficult to quantify and divide than many other assets. However, we disagree with the court in Barba that such difficulty is a reason for divesting a pensioner's spouse of an asset which was worked for and earned during coverture. Indeed, in other areas of the law, it is well established that mere difficulty in determining the quantum of value of a party's claim is no reason to bar that claim if it is otherwise established. Sandler v. Lawn-A-Mat Chem. & Equip. Corp. 141 N.J. Super. 437 (App.Div. 1976), certif. den. 71 N.J. 503 (1976).
Moreover, there are several approaches available to address the problems of valuing and dividing a nonvested pension. In general, the two broad categories applicable to such a pension are the same as those utilized for a vested pension: deferred benefit sharing and immediate offset distribution. Within each of these categories are subcategories which differ significantly from each other in detail and acceptability. Deferred benefit sharing, as its name implies, puts off distribution until a pension comes into pay status. With a vested pension, such a method may be chosen for one of several reasons. Included are *48 a disagreement between the parties as to what will actually be received; the absence of sufficient assets to enable the pensioner to buy out the spouse's interest, or a desire on the part of the spouse to receive regulated periodic payments instead of lump sum distribution. With a nonvested pension, deferred benefit sharing has the additional advantage of eliminating the conditions to which receipt of the pension is subject by awaiting their fulfillment. It credits both plaintiff and defendant with their proportionate labors toward the pension and divides equally the risk that the pensioner may not live or work long enough for the pension to be paid. If, in the interim, defendant dies or is separated from service, neither party recovers.
One type of deferred benefit sharing requires a determination of the percentage of a pension to which a spouse is entitled at the time of the divorce but postpones actual benefit sharing until the pension is received. See Flynn v. Flynn, 341 Pa.Super. 76, 491 A.2d 156 (1985); Damiano v. Damiano, 94 A.D.2d 132, 463 N.Y.S.2d 477 (1983). The spouse's percentage share is ascertained through a two-step process. The first step is to factor out that portion of the pension attributable to the marriage. This factoring involves the application of a fraction. The numerator of the fraction is the period of pension plan participation during the marriage and the denominator is the total period of plan participation necessary to the receipt of benefits. This sounds more complicated than it is. In this case the includable fraction is 16/20ths  the number of years the parties were married during which defendant accrued pension credits over the total number of years necessary for the pension to be received. The second step is to determine the percentage to which the spouse is entitled applying the standards established in Painter, supra. Here, the figure to be applied if and when the pension is received would be expressed as follows: spouse's entitlement = X% of 16/20ths of the pension. The advantage of this method is that if and when the pension is received, distribution is a ministerial act which ordinarily will not require a return to court.
*49 This approach is to be distinguished from a deferred benefit sharing scheme pursuant to which the spouse's percentage share is not determined at the time of the divorce. By this method, if the pension vests and the parties cannot agree on the spouse's share, they must return to court for a determination of this issue. We see no point to this. The criteria to be taken into account by the court in determining how equitable distribution is to be made relate to the status of the parties during the marriage and up to the time of the divorce. Post divorce changes, although relevant to alimony, do not affect equitable distribution. Thus this scheme, which unnecessarily proliferates litigation by reserving an issue for disposition beyond the divorce, involves the additional disadvantage of requiring a determination as to equitable distribution criteria at a point which is remote from the marriage. Accordingly, of the two deferred distribution schemes, we approve only the former.[3]
We caution that in utilizing the deferred benefit sharing method to address a non-vested pension at the time of a divorce, the trial judge should scrupulously avoid allowing the "possibility" that the pension will vest to affect his or her judgment as to the other issues requiring disposition. Although "guessing" is approved by our concurring colleague, and indeed, underpins his reasoning as to the particular pension before us, we think it constitutes a perilous course which can benefit neither the litigants nor the judicial system. Every ultimately incorrect guess which plays any part in a divorce distribution skews the *50 equities and compels further litigation to right the wrong. No purpose is served by such a scheme. Thus, when a trial judge is called upon to divide a marital estate which includes an unvested pension, that judge should distribute the existing assets without regard to it except for the entirely separate determination of the spouse's percentage share.
Turning to the alternate method of distribution, Kikkert made the trenchant observation that:
Long-term and deferred sharing of financial interests are obviously too susceptible to continued strife and hostility, circumstances which our courts traditionally strive to avoid to the greatest extent possible. This goal may best be accomplished, if a present value of the pension plan is ascertainable, by fixing the other spouse's share thereof, as adjusted for all appropriate considerations, including the length of time the pensioner must survive to enjoy its benefits, to be satisfied out of other assets, leaving all pension benefits to the employee himself." [177 N.J. Super. at 478]
This is an approving reference to the immediate offset method of distribution by which a pensioner with sufficient assets can retain the interest in the pension and buy out the spouse's claim for cash or asset credit at the time of the divorce. Some other jurisdictions allow the trial judge to impose this scheme on unwilling litigants. We do not adopt such an approach although we recognize that Kikkert characterized the parties' agreement to the immediate offset method merely as preferable. Kikkert, supra, 177 N.J. Super. at 477. On the contrary, we have concluded that, in the absence of unusual circumstances, the immediate offset distribution method should not be used without the approval of the parties. In our view, the pensioner has the right to await the fulfillment of the conditions for the pension before being required to pay the spouse his or her share. Just as equity should not allow a spouse to be divested of an interest in property acquired during a marriage solely because there is a condition to be fulfilled, neither should equity mandate a pensioner to pay a spouse at the time of divorce a share of a pension which might never be received. Such a payment may surely be made voluntarily, but not under the duress of a court order.
*51 Once the litigants approve the use of the immediate offset distribution method, they may either agree on the payoff figure or allow the judge to set the figure based on expert testimony. This figure is determined by an actuary or a benefits' evaluator who can assign a present value to the pension benefit
estimated to be the amount of monies the employee would take in return for giving up his right to an unknown number of future payments. This amount is discounted by actuarial calculations reflecting contingencies that could affect future pay outs, with such discounts being given for mortality, inflation, interest, probability of continued employment and probability of vesting. [Skoloff, "How to Evaluate and Distribute Employee Benefits in a Divorce," Nat'l L.J., February 13, 1984, at 25.]
See also DiFranza & Parkyn, "Dividing Pensions on Marital Dissolution," 55 Cal.St.B.J. 464 (1980); Troyan, "Pension Evaluation and Equitable Distribution," 10 Family L.R. 3001 (1983). The formula to be applied to the present value is the same as that discussed in terms of deferred benefit sharing: in this case, X% of 16/20ths of the present value.[4]
We take this opportunity to note one variation on the offset distribution method which we specifically disapprove: to assign a present value to the pension at the time of the divorce; calculate the spouse's share based on that present value, and defer distribution until the pension is received. Such an approach is indefensible. The only reason for discounting to present value is to justify the payment in present dollars of a sum of money which is not due, if at all, until some time in the future. Obviously, if distribution is deferred until that future date, discounting is unnecessary. The actual sum of the pension received is then to be shared, not some past value to which the spouse had not had access in the interim. As it would be unjust to require the pensioner to pay a full share of a future entitlement at the time of the divorce without discount, so it would be unthinkable to require the pensioner's spouse to defer receipt of an equitable share of the pension until a future date *52 but reduce that entitlement to its value as of the time of the divorce. Simply put, future benefits should not be paid in present dollars without a discount and present benefits should not be discounted to the value of past dollars. See DiPietro v. DiPietro, 193 N.J. Super. 533 (App.Div. 1984).
In the final analysis, there are a number of available ways to assure the pensioner's spouse of his or her earned share of a pension and thus do justice both to the parties and to the broad social goals contained in the statute. In our view, today's decision accords with the intentions of the framers of the equitable distribution law: that all marital assets, including pensions, should be fairly distributed upon divorce. By this decision New Jersey joins the long term movement of courts away from invoking vesting as a requirement to the distribution of pension benefits. See Laing v. Laing, 741 P.2d 649 (Alaska 1987); Van Loan v. Van Loan, 116 Ariz. 272, 569 P.2d 214 (1977); Askins v. Askins, 288 Ark. 333, 704 S.W.2d 632 (1986); In re Marriage of Brown, supra; In re Marriage of Grubb, 745 P.2d 661 (Colo. 1987); Robert C.S. v. Barbara J.S., 434 A.2d 383 (Del. 1981); Barbour v. Barbour, 464 A.2d 915 (App.D.C. 1983); Courtney v. Courtney, 256 Ga. 97, 344 S.E.2d 421 (1986); Linson v. Linson, 1 Haw. App. 272, 618 P.2d 748 (1980); Shill v. Shill, 100 Idaho 433, 599 P.2d 1004 (1979); In re Marriage of Hunt, 78 Ill. App.3d 653, 34 Ill.Dec. 55, 397 N.E.2d 511 (1979); Poe v. Poe, 711 S.W.2d 849 (Ky. Ct. App. 1986); Lookingbill v. Lookingbill, 301 Md. 283, 483 A.2d 1 (1984); Dewan v. Dewan, 17 Mass. App. 97, 455 N.E.2d 1236 (1983); Chisnell v. Chisnell, 82 Mich. App. 699, 267 N.W.2d 155 (1978), cert. denied 442 U.S. 940, 99 S.Ct. 2881, 61 L.Ed.2d 310 (1979); Janssen v. Janssen, 331 N.W.2d 752 (Minn. 1983); Kuchta v. Kuchta, 636 S.W.2d 663 (Mo. 1982) (dicta); Kullbom v. Kullbom, 209 Neb. 145, 306 N.W.2d 844 (1981); Berry v. Meadows, 103 N.M. 761, 713 P.2d 1017 (Ct.App. 1986); Damiano v. Damiano, supra; Delorey v. Delorey, 357 N.W.2d 488 (N.D. 1984); Carpenter v. Carpenter, 657 P.2d 646 (Okla. 1983) (dicta); Flynn v. Flynn, supra; Cearley v. Cearley, 544 S.W.2d *53 661 (Tex. 1976); Woodward v. Woodward, 656 P.2d 431 (Utah 1982); Wilder v. Wilder, 85 Wash.2d 364, 534 P.2d 1355 (1975); Butcher v. Butcher, 357 S.E.2d 226 (W. Va. 1987); Steinke v. Steinke, 126 Wis.2d 372, 376 N.W.2d 839 (1985), reconsid. den., 127 Wis.2d 444, 379 N.W.2d 853 (1986); Broadhead v. Broadhead, 737 P.2d 731 (Wyo. 1987).[5]
For these reasons, we have determined that the trial judge erred in relying on Barba to exclude defendant's pension plan from the pool of marital assets. We thus reverse and remand the matter to the trial judge for disposition of this issue.
Plaintiff has also challenged several aspects of the trial judge's order including the insufficiency of the alimony and child support awards; the failure to require defendant to pay unreimbursed dental expenses, and the determination that a $4100 obligation paid by defendant was a marital debt. (Defendant filed a notice of cross-appeal addressed to the issues of alimony and child support although his brief on the merits does not challenge the trial court's determination on these matters). We affirm as to these issues because we have concluded that the trial judge's findings and conclusions are adequately supported by the evidence. R. 2:11-3(e)(1)(A).
Affirmed in part; reversed and remanded in part.
D'ANNUNZIO, J.A.D. (concurring).
I concur in the result achieved by the majority, i.e., that the husband's military pension is subject to equitable distribution. However, I reach this conclusion by a different route.
*54 I do not join in my colleagues' criticism of Barba v. Barba, 198 N.J. Super. 205 (App.Div. 1985). There is no conflict between Barba and McGrew v. McGrew, 151 N.J. Super. 515 (App.Div. 1977). In McGrew, the pension plan required 10 years of employment before a worker became eligible. The husband in McGrew had been employed for 26 years, had attained the age of 58 and had the right to begin collecting his pension at any time he chose to do so. The Appellate Division reversed a trial court decision which excluded the pension from equitable distribution. In Barba, the husband had been employed for six years and was age 55. The pension plan required 10 years of employment and age 65 for ordinary retirement. Early retirement was available after 20 years of employment. Because of the significant shortfall in work years and age, the court in Barba held that the husband had not acquired during the marriage a property right in a pension which would be subject to equitable distribution. In my view, both McGrew and Barba were correctly decided. They do not conflict because their facts differ significantly. Moreover, because of its facts I do not view McGrew as the beacon which lights the way in the present case.
I also reject the majority's suggestion that Kikkert v. Kikkert, 177 N.J. Super. 471 (App.Div. 1981), affirmed o.b. 88 N.J. 4 (1981) expresses our Supreme Court's view of the pension vesting issue in this case. It does not. Kikkert involved a pension which had vested but had not matured.
Barba, though correctly decided, does not govern the present case. The facts in the present case are different. The present case involves entitlement to military retirement pay which provides substantial amounts of money to retired military personnel while they are in the prime of their lives. Most persons begin military service in their late teens to their mid-twenties. Therefore, they become eligible for 20 year pensions from their *55 late-thirties to their mid-forties.[1]
In November 1988, Major Whitfield will be a few months short of his 43rd birthday. At that time he will have the right to retire and to receive military retirement pay for the rest of his life commencing at the rate of approximately $1,500 per month. The value of that entitlement in November 1988 would be in six figures. Moreover, the entitlement would not be conditioned on Major Whitfield withdrawing from any active employment. He would have the right to collect his military retirement pay and pursue any career open to him. Thus, Major Whitfield's future entitlement to military retirement pay represents a substantial future asset. Considering the substantial value of that asset and the fact that he had completed 80% of the eligibility requirement when the divorce complaint was filed, it was highly probable that Major Whitfield would continue in military service long enough to vest his pension rights. Indeed, considering the probability in light of "the common experience of mankind," Ciuba v. Irvington Varnish & Insulator Co., 27 N.J. 127, 139 (1958), the inference is compelling. The probability of eventual vesting is so great in this case that Major Whitfield should be deemed to have constructively acquired[2] his pension rights at the time the complaint was filed.
*56 Under the majority opinion, a marriage of short duration will create a long-term interest in a speculative pension entitlement. It is an interest which, if realized at all, may not be realized until decades after the divorce when there is no longer any point to the continuation of an economic relationship between the parties. For example, a two-year marriage during which a spouse earns the first two years of credit toward a ten year vesting requirement (20 years in the military) will result in the other spouse acquiring a right to some percentage of the retirement benefits if and when they are received 30 or 40 years in the future. The equitable tool of constructive acquisition avoids the creation of long-term unrealized interests because constructive vesting is based on a very high probability, an almost compelling certainty, that the pension will vest as well as on the likelihood that benefits will be enjoyed during middle age.
In the event of multiple marriages, the majority's rationale will subject the same pension to multiple equitable distribution awards. Adherence to a vesting requirement, either actual or constructive, insulates a pension from multiple awards because a vested pension is not capable of being acquired during a subsequent marriage.
The majority's rationale ignores several New Jersey Supreme Court decisions which have emphasized vesting as an element of equitable distribution. In Kruger v. Kruger, supra, the Court affirmed a ruling that the husband's vested and matured military pension was subject to equitable distribution. In dictum, the Court referred to earlier Appellate Division and trial court decisions and noted that "[e]ach of these cases acknowledged expressly or implicitly that, if the spouse acquired during the eligible period of the marriage a nonforfeitable or vested interest in the pension prior to retirement, that interest was subject to equitable distribution. That principle is sound." Id. 73 N.J. at 469.
*57 In Gauger v. Gauger, 73 N.J. 538 (1977) the Court reversed lower court rulings which excluded from equitable distribution a husband's interest in a tract of land acquired by the husband and his mother as joint tenants prior to his marriage. The mother died during the marriage, but before the divorce complaint was filed. The Supreme Court ruled that the husband acquired an undivided fee ownership in the entire tract at his mother's death during the marriage, thereby subjecting one-half the net value of the property to equitable distribution under the statute.
Mey v. Mey, 79 N.J. 121 (1979) involved a trust created by the husband's grandfather prior to the husband's marriage. Under the terms of the trust the husband was to receive the principal when he attained the age of 25. He attained that age during the marriage. In affirming lower court rulings that the principal was subject to equitable distribution the Supreme Court adopted the Appellate Division's interpretation of the relevant statutory language:
... we regard the phrase "legally and beneficially," as did the trial judge, to mean that the spouse acquires the property within the intention of N.J.S.A. 2A:34-23 when he or she acquires a title which carries with it the effective power to control or use or enjoy. [Id. at 124.][3]
Utilizing the principle of constructive acquisition as a basis for equitable distribution of a pension preserves the vesting requirement and, therefore, is in harmony with these decisions and legislative intent.
I agree, in general, with that part of the majority opinion which discusses distribution methodology. I specifically agree that the deferred benefit sharing method through which the wife is entitled to some portion of 16/20ths of the pension when it is received is the probable appropriate method of distribution in this case. However, I would not impose this device on the *58 parties at this posture of the case. I would afford the parties and the trial judge an opportunity on remand to address the issue of distribution methodology.
NOTES
[1] Painter, supra, included property acquired by gift or devise in this definition, but such property was later excluded by amendment to N.J.S.A. 2A:34-23.
[2] McGrew also laid to rest the distinction between contributory and noncontributory pensions established in Pellegrino, supra.
[3] Pensions governed by the Employee Retirement Security Act of 1974 (ERISA), as amended, 29 U.S.C. §§ 1001 et seq. were affected by the Retirement Equity Act of 1984 (P.L. 98-397) (REA) which offers a mechanism for the pre-retirement division of such plans. The REA provides for a Qualified Domestic Relations Order (QDRO) which, in effect, allows for an alienation of the spouse's share of plan benefits at the time of divorce but continues those benefits in a separate plan so that the spouse can enjoy the same tax deductible asset appreciation as the pensioner. 29 U.S.C. § 1056(d)(3)(A) (Supp. III 1985); I.R.C. § 414(p)(1)(B) (1982 & Supp. III 1985). See Brown, "Division of Retirement Plan Assets Upon Divorce," 3 Journal of the American Academy of Matrimonial Lawyers 33 (1987).
[4] For a more detailed discussion of each of the methods of distribution see Hardie, "Pay Now or Later: Alternatives in the Disposition of Retirement Benefits on Divorce," 53 Cal.St.B.J. 106 (1978).
[5] Some jurisdictions have also made nonvested pension interests subject to equitable distribution through statute: Ind. Code § 31-1-11.5-2(d)(3) (Supp. 1986) (definition of "property" includes "right to receive disposable retired or retainer pay, as defined in 10 U.S.C. 1408(a) [USFSPA], acquired during the marriage, that is or may be payable after the dissolution of marriage."); Va.Code § 20-107.3(G) (Supp. 1986) (statute authorizes award of up to one-half of vested or nonvested pension); Wis. Stat. Ann. 767.255 (1979) (property division includes consideration of "other economic circumstances of each party, including pension benefits, vested or unvested, and future interests").
[1] Statistics provided by the Armed Services Committee of the United States House of Representatives indicates that military personnel begin receiving military retirement pay at an average age of 41 for enlisted men and 43 for officers. Currently 449,313 officers and 941,168 enlisted personnel are receiving military retirement pay. Current monthly military retirement pay is $1,427,753 per month or $1,019 per month per recipient. Of course, the military pay for officers is higher than that of enlisted personnel.
[2] Cf. D'Ippolito v. Castoro, 51 N.J. 584, 588 (1968) ("a constructive trust will be imposed in any case where to fail to do so will result in unjust enrichment."); Stewart v. Harris Structural Steel Co., 198 N.J. Super. 255 (App.Div. 1984); Callano v. Oakwood Park Homes Corp., 91 N.J. Super. 105, 108 (App.Div. 1966) (A constructive contract is a legal fiction which "rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another....").
[3] Although Gauger and Mey do not control the issue in this case, see Kikkert, supra, 177 N.J. Super. at 476, they demonstrate the importance of "vesting" in our Supreme Court's consideration of the statutory language "legally and beneficially acquired during the marriage." [N.J.S.A. 2A:34-23]