710 A.2d 556

LINDA REINBOLD, PLAINTIFF–APPELLANT, v. FRANK
REINBOLD, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued March 17, 1998—Decided May 14, 1998.

Before Judges LONG, STERN and KLEINER.

*Bonnie C. Frost,* argued the cause for appellant (*Einhorn, Harris, Ascher, Barbarito, Frost & Ironson,* attorneys; *Ms. Frost,* on the brief).

*Sanford M. Kahan,* argued the cause for respondent (*Simon & Enright,* attorneys; *Mr. Kahan,* of counsel and on the brief).

The opinion of the court was delivered by

LONG, P.J.A.D.

Plaintiff Linda Reinbold and defendant Frank Reinbold were married on October 29, 1960. Two children were born to them, both of whom are emancipated. After thirty-four years of marriage, plaintiff filed a complaint for divorce on June 20, 1994. At the time the complaint was filed defendant was 55 years old and had 28 years of service at Sandoz Pharmaceuticals ("Sandoz").

The parties entered into a Property Settlement Agreement which was incorporated into the final judgment of divorce on May 13, 1996. Among other provisions, the defendant agreed to pay plaintiff permanent alimony and the parties agreed to equally divide the marital assets. Paragraph 27 of the Property Settlement Agreement addressed the equitable distribution of defendant's pension which had been accrued through his employment with Sandoz:

27. The Husband has a pension plan through his employer, Sandoz. The Wife shall receive 50% of all of the benefits the Husband acquired in this pension from the date of marriage to the date of Complaint by way of a Domestic Relations Order. By virtue of the long term marriage, the Wife shall be named as a Joint Survivor on any Pre-retirement survivor annuity as well as on any post-retirement survivor annuity, accrued from the date of marriage to the date of the complaint for divorce, if permitted by the pension plan.

Under the Sandoz retirement plan (the "Plan"), defendant could take normal retirement at age 62. The basic retirement benefit was to be calculated based upon defendant's average annual compensation and years of credited service (maximum 40 years) with a Social Security offset. The Plan defined these terms as follows:

**Average Annual Compensation**

Your average annual compensation is initially based on your total compensation paid over the last ten calendar years preceding your date of retirement. From this ten-year period, your total compensation over the five highest possible average, is extracted and averaged. Total compensation is all compensation paid you in the form of salary and wages, overtime, shift premium, bonus and commissions. [example omitted].

**Credited Service**

Credited Service is used to determine the amount of your benefits under the Plan. Credited service is accounted for in years and months.

All service rendered by you to the company prior to your sixty-fifth birthday will be recognized as credited service, up to a *maximum of forty years*. If you terminate your employment with Sandoz and return to the company at a later date, or if in the past you terminated employment with the company and have since been rehired, all prior service rendered by you to the company will be recognized as credited service. However, your prior service will be recognized only after you have completed one year of continuous service since your most recent date of hire.

### Primary Social Security Benefit

Your Primary Social Security Benefit is the Social Security Benefit to which you alone are entitled, and does not include any benefits applicable to your spouse and/or dependents.

The Social Security benefit on which your Social Security offset will be based will be determined by reference to actuarial tables supplied by the Retirement Plan Actuary. The use of these tables is intended to develop Social Security benefit values which closely approximate those an employee is likely to receive based on his/her final average compensation at Sandoz. These tables do not necessarily represent the exact actual Social Security benefit to which you are entitled.

### Basic Retirement Benefit Formula

The Basic Retirement Benefit Formula is:

1 1/2% of your Average Annual Compensation times

your Years of Credited Service minus

1 1/4% of your Primary Social Security Benefit times

your Years of Credited Service.

The calculation of defendant's pension benefit was to take place at retirement because it depended on his length of service, his average annual compensation and his Social Security benefit at that time. Other benefits were also available including an early retirement benefit bearing a penalty for each year prior to age 62.[1]

In July of 1996, approximately two months after the divorce was finalized, Sandoz offered defendant a voluntary retirement incentive package as a result of its merger with Ciba–Geigy and the downsizing that this merger brought about. According to defendant, employees who were offered the retirement incentive pack-

---

[1] From the pension materials submitted by the parties it appears that a Sandoz employee could take early retirement if he or she was 50 years old and had worked for Sandoz for 10 years. We reach this conclusion based on the pension calculation methodology which requires averaging the last ten years of compensation and the early retirement penalty provision which only begins at age 50.

age could either accept the package or face the possible elimination of their jobs. Defendant accepted the package and retired on October 1, 1996, more than two years after the divorce complaint was filed.

To qualify for the voluntary retirement incentive package defendant had to meet the following qualifications: be

a regular employee of Sandoz Pharmaceuticals, *and,*

as of December 31, 1996, are age 55 or older with at least 10 years of service, *and*

make your decision to participate and return the Election to Participate/Release Agreement form by August 30, 1996, *and*

agree to retire on October 1, 1996.

At the time this incentive package was offered to defendant he was 57 years old and had 30 years of service at Sandoz.

According to the incentive package, an employee's enhanced pension benefit was to be determined by:

Adding an additional five years of service *and* five years of age in calculating your pension benefit.

Adding five years means adding five years to the service you actually have.

Adding five years of age means that you are assumed to be five years older for determining your early retirement reduction factor, if any.

For example, if you are age 56 and have 10 years of service, your pension benefit will be calculated as if you are age 61 with 15 years of service. The benefit will then be reduced by 2% for the year between ages 61 and 62 when 100% of the benefit would be payable. Without the enhancements offered by the [voluntary retirement incentive], a pension starting at age 56 would be reduced by 20%.

Pursuant to this package, five years were added to defendant's age and years of service which thereby increased the value of the pay-out. Although defendant was only 57 years old with 30 years of service at the time he retired, he was deemed to be 62 years old and credited with 35 years of service. Because he was assumed to be 62 years old there was no early retirement reduction.

Defendant also received a "Special Incentive Payment (Severance Pay)" of $56,924.41 which was calculated as follows:

A special incentive payment equal to two weeks of annualized total compensation for each year of service with the company *plus* eight weeks of annualized total compensation will be paid to you. By counting months of service, the payment calculation will also include partial years of service.

In addition, he received extended medical and dental benefits, an investment plan and special transitional benefits. Only the enhanced pension is at issue here.

In furtherance of the Property Settlement Agreement, both parties' counsel submitted a proposed form of QDRO (Qualified Domestic Relations Order) to the pension administrator at Sandoz. The parties agree that the methodology submitted to the pension administrator was an effort to set forth a coverture fraction to be applied to defendant's pension benefit at the time of retirement. Due to letter transpositions, the fraction as actually set forth in the QDRO proposal was inaccurate. At oral argument, the parties acknowledged this and agreed that the QDRO provision should have read:

$$\frac{28 \text{ years (employment during coverture)}}{\text{Number of years worked}} \times \text{Pension Benefit} \times 50\%$$

Because the QDRO was not yet in place when defendant began receiving his pension, plaintiff did not receive her share at that time. Defendant, however, placed plaintiff's full one-half pension share into a separate interest bearing account until the matter was resolved. On March 20, 1997, plaintiff filed a notice of motion for post-judgment relief seeking, among other things, a determination as to whether the enhanced pension was to be shared by her and also seeking counsel fees.

On April 7, 1997, defendant filed a notice of cross-motion seeking an order denying plaintiff's request to share in the increased value of his pension. The judge determined that plaintiff was not entitled to share in defendant's enhanced pension:

This is a request by the plaintiff that the Court determine the denominator of the coverture f[r]action to consist of the defendant's entire years of service at Sandoz CIBA. Paragraph 27 of the judgment of divorce compels the defendant to turn over to the plaintiff 50 percent of all of the benefits the husband acquired in this pension from the date of the marriage to the date of the complaint, by way of a domestic relations order.

In July 1996, defendant was offered an early retirement package, which he took. [Plaintiff] feels she is entitled to share in the voluntary retirement incentive package. The defendant feels plaintiff should not share in same because this

voluntary retirement incentive package was offered to the defendant two months after the divorce.

The language of the property settlement agreement judgment of divorce is clear. Plaintiff is to receive 50 percent of the pension up to the date of the filing of the complaint. [Defendant] received his package two months after the divorce. The complaint was filed June 20th, 1994; the divorce was granted on May 13th, 1996.
 * * *

Counsel requests $2,362.50 attorney's fees which is denied.

Plaintiff appeals from this decision, contending that defendant acquired all the benefits in the plan during the marriage and that the voluntary retirement package was not a result of defendant's post-complaint work efforts. She also claims entitlement to counsel fees. Defendant counters that the trial judge acted properly by "refusing to modify the clear and precise terms of the property settlement agreement," that the pension enhancement is not subject to equitable distribution and that plaintiff is not entitled to counsel fees. We have carefully reviewed this record in light of the parties' arguments and have concluded that plaintiff is entitled to share in defendant's voluntary retirement package. Thus, we reverse.

We begin our analysis with the Property Settlement Agreement itself which all parties acknowledge created a classic "deferred distribution" scheme in which the "non-employee spouse does not receive any benefit until the benefits are actually paid to the employee spouse." *Moore v. Moore*, 114 *N.J.* 147, 159, 553 *A.2d* 20 (1989). Deferred distribution was chosen here because defendant's defined benefit pension, which was dependent on how much he earned and how long he worked and was subject to a Social Security set-off, would not be calculated until he retired. *See Marx v. Marx*, 265 *N.J.Super.* 418, 428, 627 *A.2d* 691 (Ch. Div.1993). In such a scheme the actual numerator of the coverture fraction is fixed (here at 28 years, the period of the marriage during which defendant worked for Sandoz up to the filing of the complaint). The denominator is also fixed at the number of years *in all* that defendant *will have worked* as of retirement. Obviously, the number itself cannot be supplied until retirement. The longer the employee spouse works, the larger the denominator,

thus reducing the non-employee spouse's percentage share and assuring the employee spouse the benefits of his or her post-divorce labors. In general, "the non-employee spouse will receive a decreasing percentage of an increasing benefit." William M. Troyan, *Pension Evaluation and Equitable Distribution*, 10 Fam. L. Rep. 3001, 3007 (1983). Thus, in this case, as the parties agree, if defendant had actually worked 35 years until age 62, plaintiff would have been entitled to

$$\frac{28 \ (employment \ during \ coverture)}{35 \ (years \ actually \ worked)} \quad \times \ \text{Benefit} \ \times \ 50\%$$

The complicating factor here is the retirement incentive package offered to defendant after the divorce. It is this package which is the subject of the parties' contest over distribution. In order to determine whether property is subject to equitable distribution, it is necessary to assess whether it was "legally and beneficially acquired" by the parties during the marriage. *Kikkert v. Kikkert*, 177 *N.J.Super.* 471, 474–475, 427 *A*.2d 76 (App. Div.), *aff'd o.b.*, 88 *N.J.* 4, 438 *A*.2d 317 (1981). Whether the enhanced pension is includable in the marital estate depends upon the nature of the property and how it was earned. *Whitfield v. Whitfield*, 222 *N.J.Super.* 36, 47, 535 *A*.2d 986 (App.Div.1987). *See McGrew v. McGrew*, 151 *N.J.Super.* 515, 518, 377 *A*.2d 697 (App.Div.1977) (considering to what extent the pension benefits have been produced by the mutual effort of the parties).

In *Whitfield*, the issue presented was whether the husband's air force pension, which did not vest until four years after the parties separated, was includable in the marital property subject to equitable distribution. The parties separated after 16 years of marriage. The husband argued that his pension was not "earned" until he served 20 years and that was the time the pension was acquired for includability purposes. *Whitfield, supra*, 222 *N.J.Super.* at 45–46, 535 *A*.2d 986. We disagreed:

If we were to accept this superficial analysis as a bar to the inclusion of this significant asset in the marital estate, we would be paying lip service to the theory of equitable distribution while ignoring the reality before us. These parties were married for sixteen years during which time they experienced all of the joys and

sorrows of married life. They raised three children. It is uncontroverted that they labored, shoulder to shoulder in the military, establishing homes and supporting their family, both financially and emotionally, all over the world. During the entire marriage, defendant was accumulating credits toward his pension which both parties anticipated he would receive in 1988. *Clearly, this pension will not be earned on the 20th anniversary of defendant's entry into the service. Rather, it was earned during each and every day of his 20 years of employment in the military, 16 years of which were spent in the military, 16 years of which were spent in a "shared enterprise" with plaintiff.*

[*Id.* at 46, 535 *A*.2d 986. (emphasis added).]

Accordingly, we determined that the husband's pension was includable as marital property and that it could not be excluded from the distributable estate "because of the fortuitous timing of the failure of this marriage." *Ibid.*

In *Moore, supra,* the issue presented was whether a husband's post-retirement cost-of-living pension increases were marital property subject to equitable distribution. The court determined that the increases in the pension qualified as marital property. *Moore, supra,* 114 *N.J.* at 158, 553 *A*.2d 20. In arriving at this conclusion, the court cited *Whitfield* for the proposition that the nature of the property and how it was earned is the crucial question in determining whether it is subject to equitable distribution. *Id.* at 157, 553 *A*.2d 20. (citation omitted). Because the increases in *Moore* were found to be unrelated to either the husband or wife's future efforts but attributable to "past contributions and services," the court concluded:

[T]he segment of cost-of-living increases attributable to those contributions and services made during the marriage from the joint efforts of both parties are subject to equitable distribution.

[*Ibid.*]

Several other decisions are instructive on this issue. In *Hayden v. Hayden,* 284 *N.J.Super.* 418, 665 *A*.2d 772 (App.Div.1995), another panel of this court excluded a post-divorce pre-retirement cost-of-living increase in valuing a husband's pension. In reaching its conclusion, the court recognized that the cost-of-living increases in *Moore* were merely adjustments to "the pension payments for the then current real value of the dollar." *Id.* at 423, 665 *A*.2d 772. As such, they were "as much a part of the pension as the

amounts initially established by the pension system on retirement...." *Ibid.* On the contrary, the court in *Hayden* found, as a fact, based on its analysis of the pension before it, that the cost-of-living component of pre-retirement salary increases were directly related to work performed *after* the divorce and thus outside the distribution scheme. *Id.* at 424, 665 *A.*2d 772.

In *Ryan v. Ryan,* 261 *N.J.Super.* 689, 619 *A.*2d 692 (Ch. Div.1992) the issue was whether the husband's severance pay, which he received over two years after the divorce complaint was filed, was subject to equitable distribution. The husband was offered a severance payment by his employer as an "inducement to leave the company" and as a result of his company's desire "to reduce its overall work force." *Id.* at 693, 619 *A.*2d 692. The trial judge determined that the payment was based upon the husband's weekly pay and years of service. *Id.* at 696, 619 *A.*2d 692. Accordingly, the judge concluded that "the severance payment was compensation for past labor, not a replacement for future earnings, because the amount was based on the [husband's] past services to IBM." *Id.* at 697, 619 *A.*2d 692. Therefore, the payment was considered a marital asset subject to distribution.

Most recently, in *Pascale v. Pascale,* 140 *N.J.* 583, 611, 660 *A.*2d 485 (1995), the Supreme Court ruled that stock options awarded after the filing of a divorce complaint but obtained as a result of efforts expended during the marriage should be subject to equitable distribution:

> With regard to the stock options, we continue to balance the need for definitiveness embodied in the date-of-complaint rule with the need for flexibility inherent in equitable distribution. Assets or property acquired after the termination of the marriage, but as a reward for or a result of efforts expended during the marriage, normally will be includable in the marital estate and thus subject to equitable distribution.
>
> [*Id.* at 612, 660 *A.*2d 485.]

Each of these cases recognizes and applies the same well-established rule: that assets acquired by gainful labor during the marriage or as a reward for such labor are distributable while

assets acquired after dissolution due solely to the earner's post-complaint efforts are his or her separate property.

Here, defendant argues that the enhanced pension was not earned during the marriage but was a "replacement for his future earnings" which would otherwise have been his separate property and thus not includable in the distributive pot. A review of the plan, however, belies this view. The enhanced pension benefit was a concomitant of the takeover of Sandoz by Ciba-Geigy, obviously intended to thin the herd of aging Sandoz employees as part of an overall downsizing. It was not offered to every employee who was in danger of losing his or her job. On the contrary, the pension incentive was only offered to employees who had reached age 55 and had worked for Sandoz for 10 years. In other words, it was offered in recognition of age and faithful service. Defendant had already met the qualifications for the incentive package at the time the divorce complaint was filed. He was then 55 years of age and had worked for Sandoz for 28 years. No effort on his part beyond what took place while he was married to plaintiff caused the accretion of his pension. To be sure, accretion due solely to the diligence and industry of a party go to him or her alone. *Bednar v. Bednar*, 193 *N.J.Super.* 330, 333, 474 A.2d 17 (App.Div.1984). That is not the case here. Here, defendant received the benefit of the pension incentive package because of his age and as a reward for his length of service which was attributable to his efforts during the marriage. *Pascale, supra*, 140 *N.J.* at 609, 660 A.2d 485.

That the pension enhancer was not a substitute for "future earnings" is underscored by the fact that Sandoz provided a separate severance package for all terminated employees as a direct replacement for future lost earnings. Under the Sandoz program, every terminated employee would receive:

> severance pay based on 3 weeks of annualized total compensation per year of service plus 8 weeks of annualized total compensation as notice pay; the minimum will be 26 weeks and the maximum will be 104 weeks of combined notice and severance pay.

■ Defendant also received what Sandoz denominated as "severance pay" at a rate of two weeks for each year of service (not three as in the case of an employee who was involuntarily terminated) but otherwise according to the same formula. This is the replacement for future earnings component of defendant's benefit. Like future earnings it is not subject to equitable distribution. In this respect, we note our disagreement with the conclusion reached in *Ryan v. Ryan, supra,* which we believe failed to account for the nature of a severance benefit. There the trial judge characterized a severance pay package as distributable because it was calculated based on years of service. *Ryan, supra,* 261 *N.J.Super.* at 697, 619 A.2d 692. The problem with this analysis is that it fails to differentiate between entitlement and methodology. Only those benefits to which an employee's entitlement arises out of labors during the marriage are distributable. Severance pay is not such a benefit but is a wage continuation initiative, replacing current and future earnings which would unarguably be the earner's separate property after divorce. In an alimony situation severance pay, as a replacement for income, is a fund from which such alimony can be paid. Where no alimony is involved, the severance pay belongs solely to the terminated worker who, upon its receipt, is in no better economic condition and whose ex-spouse is in no worse economic condition than would have been the case if the worker had continued working after the divorce. The fact that severance pay is calculated based on years of service is of no consequence. This is simply a mathematical device unrelated to the question of the nature of the benefit and when it was earned. While it is true that longevity of service increases the amount of severance pay, the same can be said of post-divorce earnings, about which there is no suggestion of distributability. Indeed, we note that plaintiff here made no application to distribute the severance pay component of the pension incentive package because she obviously understood this distinction.

In sum, the pension enhancer here was clearly distributable by application of the coverture fraction the parties agreed on because

it was earned as a reward for service during the marriage. The decision to take the early retirement package clearly benefitted defendant. If economic justice is the goal, there is no reason why plaintiff, who spent 28 years with defendant while he worked at Sandoz during which years he qualified for the pension incentive, should not share in that benefit.

This is not to suggest that parties cannot bargain away early retirement incentives or other pension enhancers. However, where they are earned in whole or in part during the marriage, they are includable in the pot for equitable distribution absent a bargain to the contrary. Lawyers should keep this in mind in negotiating matrimonial settlements. Future pension benefits can be fluid and changeable; it is often uncertain at the time a deal is struck what the exact value of the bargained for benefit will be when it is paid out. Thus, precision in setting forth the intent of the parties as to future pension enhancements is crucial to avoiding further acrimonious litigation.

■ We turn finally to the issue of what the denominator of the coverture fraction should be in this case. Is it 28/30 which would reflect the actual years worked by defendant or 28/35 reflecting the years added to his service by the company? We think the former is the correct denominator because it reflects reality. Defendant worked two years after the filing of the complaint before he retired. Thus 28/30 reflects the differential between employment during coverture and further employment. The gift of 5 extra years of service should not be used to reduce plaintiff's fractional share of the pension when no work was actually performed for that service.

Reversed and remanded for calculation of plaintiff's share of defendant's pension consonant with the principles to which we have adverted and for a redetermination of plaintiff's application for counsel fees applying the standards of *Williams v. Williams,* 59 *N.J.* 229, 233, 281 *A.*2d 273 (1971).