853 A.2d 997 (2004)
371 N.J.Super. 518
Wendy HELLER-LOREN, Plaintiff-Appellant/Cross-Respondent,
v.
Salvatore J. APUZZIO, III, Defendant-Respondent/Cross-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued telephonically March 4, 2004.
Decided August 3, 2004.
*998 Barry I. Croland, Hackensack, argued the cause for appellant/cross-respondent (Shapiro & Croland and Smits & Solotoff, attorneys; Mr. Croland, of counsel; Jay Rubenstein, on the brief).
Jacqueline M. Printz, Woodbridge, argued the cause for respondent/cross-appellant (Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, attorneys; Ms. Printz, of counsel and on the brief).
*999 Before Judges STERN, LEFELT and PAYNE.
The opinion of the court was delivered by
STERN, P.J.A.D.
Plaintiff, former wife, appeals from an order of August 12, 2002, providing that stock options and proceeds from stock option sales by defendant, former husband, are "not includable as part of defendants' gross earned income," and "not includable for purposes of computing defendant's child support" obligation under the parties' property settlement agreement ("PSA"). Defendant cross-appeals from paragraphs of a second order, also entered on August 12, 2002, holding him "in violation of litigant's rights for refusing to comply with paragraph 2.3" of the PSA, ordering him to comply with that paragraph and declining to modify the agreement. Paragraph 2.3 required defendant to contribute 11.6% of his "gross income" above $180,000 as additional child support.
On the wife's appeal, we conclude that the exercise and sale of stock options acquired after the parties' divorce cannot be deemed part of "gross income" for purposes of the child support provisions of the PSA in this case. We emphasize, however, that our decision is based on the particular PSA in question.
The PSA in this case treated existing stock options acquired during the course of the marriage as assets, and provided that the parties each retained their respective stocks and existing stock options. Pascale v. Pascale, 140 N.J. 583, 607-11, 660 A.2d 485, 497-99 (1995), which in the absence of an agreement to the contrary, treats stock options earned during the marriage as assets subject to equitable distribution, does not govern this case.
Absent a PSA dictating otherwise, the law generally holds that income is generated by the exercise of an option earned and acquired post-divorce if exercised at a price below fair market value or if sold at a profit. It does not support the contention that stock options should be treated as income upon mere vesting. Although in the year 2000 defendant sold stock acquired by the exercise of options, we agree with the motion judge that the sale did not generate "income" for purposes of the additional child support provisions of the parties' PSA. We also reject the husband's cross-appeal seeking a reduction of his additional child support obligations.

I.
The parties were married in 1985 and divorced in 1997. They have a son born in 1992 and a daughter born in 1995. Plaintiff's income for 1996, the year before the counseled PSA was negotiated, was approximately $141,000, and defendant's was about $245,000. However, the parties agreed to use an average of their respective incomes over the prior three-year period for purposes of calculating child support. Both parties' incomes reflected commissions as well as base salaries.
The parties entered into the PSA on October 14, 1997. It provided for joint legal custody of the children and gave plaintiff "primary physical and residential custody." Neither party received alimony and support from the other independent of the husband's child support obligation.
The PSA noted that plaintiff, who worked for IBM, had purchased IBM shares during the marriage through an employee stock purchase plan, and that defendant had a vested right to exercise an option on shares of Platinum Technology, one of his employers during the marriage. The PSA further recited that plaintiff was "entitled to retain all the IBM stock" and that defendant was "entitled to retain his options."
*1000 The PSA obligated defendant to pay $2,500 per month in child support, based on the parties' expectation that their annual incomes for 1997 would be $180,000 for defendant and $130,000 for plaintiff. In addition, defendant would pay additional child support equal to "11.6% of his gross income over $180,000.00 per year." Specifically, the PSA provided:
2.2 The Husband agrees to pay the Wife the sum of $2,500.00 per month commencing on November 1, 1997, one-half on or before the first and one-half on or before the fifteenth of each month for child support for the unemancipated children, Torey and Samantha. The Husband represents that his 1997 income through October 15, [ ]1997 is $126,667.00 and that he expects his gross income in 1997 to be approximately $180,000.00. The Wife represents that her 1997 income through October 15, 1997 is $98,743.00 and that she expects her gross income in 1997 to be approximately $130,000.00. The parties acknowledge that the support is based on the Husband's annual income of $180,000.00 and the Wife's annual income of $130,000.00. The Husband shall make the child support payments through the Morris County Probation Department on or before the first of each month.
2.3 In addition to the child support in paragraph 2.2, the Husband shall pay the Wife child support of 11.6% of his gross income over $180,000.00 per year. For example, in the event that Husband's earned gross income from all sources in January, 1998 is $10,000, he shall pay $2,500 per month child support for February, 1998. In the month his gross exceeds $180,000.00, he shall pay the base support set forth in paragraph 2.2 plus 11.6 cents for each $1.00 ($11.60 per $100.00) his gross income exceeds $180,000.00. Thereafter, he shall pay one-half of the base support on or before the first and one-half on or before the fifteenth of the month and extra support on a monthly basis when he receives his check. In the event that the Husband has to pay back his employer for a commission he received from which he paid the Wife the 11.6% as required in this paragraph, the Wife shall repay or credit the Husband the amount she received from the overpayment when he has to pay his employer. The Husband shall provide the Wife with a copy of all commission statements and any other information verifying such charge backs. The Husband shall provide the Wife with a copy of his paystubs monthly and commission statements quarterly within five days of receipt of same.
Under paragraph 2.7 of the PSA, certain specified expenses for the children ("the shared expenses") were to be treated separately from the child support and the additional child support (62.3% to be paid by defendant and 37.7% by plaintiff). It based the parties'"proportionate share" of those expenses on their "gross earned income," which it defined as "all gross wages, commissions, salaries, bonuses and income from businesses." The respective shares were to be "recalculate[d]" annually based on the mutual disclosure of "W-2 forms, verification of all commissions earned during the year and records of all gross business income for the prior year." If the parties disputed the amount of either party's "gross earned income," they were to "agree on and cooperate with accountants to calculate the figures."
The October 15, 1997 judgment of divorce incorporated the PSA upon noting that each party "testified that they entered into the agreement knowingly and voluntarily" and sought "to be bound by the terms thereof."
In June 1998, plaintiff remarried. In October 1998, defendant remarried, and *1001 the following year he and his new wife had twins. It is undisputed that in 1998, defendant's gross earned income was $87,378, and in 1999 it was $124,315. In September 1999, defendant began working at Interwoven, Inc., for a base salary of $70,000 (which was subsequently increased to $89,320) plus commissions. Interwoven granted defendant stock options upon hiring him.[1]
In November 2001, defendant moved for a declaration that his stock options from Interwoven or any proceeds from their sale were "not includable as part of defendant's gross earned income" for purposes of the PSA and were "not includable for purposes of computing defendant's child support" obligation. Plaintiff cross-moved for a declaration that those stock options were part of defendant's "gross income" for purposes of child support as of the day that they vested or when defendant was entitled to exercise them, and for a declaration that defendant violated the terms of the PSA by failing to pay additional child support based on his gross income. Defendant thereafter moved for an order to modify the PSA "by vacating the defendant's obligation to pay as additional child support 11.6% of defendant's gross income over $180,000 per year."
In his original motion, defendant certified that when he worked for different companies his compensation always included a base salary, plus commissions that varied "unpredictably." Of the six employers he had during the marriage, only one, Platinum Technology, awarded him stock options. He did not exercise Platinum Technology options before the divorce, and exercised and sold Platinum Technology stock only once thereafter. He apparently did so to satisfy "obligations" to plaintiff that he could not otherwise meet after the loss of an anticipated large commission kept his 1997 gross income below the expected $180,000 income. Significantly, plaintiff does not seek to include those proceeds in defendant's income for present purposes.
In his certification defendant also explained the stock options received at Interwoven:
12. I was awarded stock options twice during my employment at Interwoven, upon commencing employment and one time subsequently. More than half of those options have not vested. I have exercised Interwoven stock options on only a single occasion (in December 2000). I did so to capitalize on the advantageous strike price and I did so, not to supplement income, or as part of any new expectation that stock options or stock sale proceeds would now represent a regular component of my income. I used the stock sale proceeds from that December 2000 stock option exercise to make certain capital improvements to my home, to make investments, and to pay certain debt.
13. As part of my Interwoven employment, I have received two grants of incentive stock options (ISOs). The first grant (Grant Number 980366) occurred upon my offer of employment. I was granted 10,000 options and they were scheduled to vest over a period of four years; that grant was effectuated October 4, 1999. Twenty-five percent (25%) of those Interwoven options vested on the first anniversary of my employment agreement (September 2000); the remaining options vest at a rate of approximately 2% each month. Shortly after I *1002 started at Interwoven, on or about October 14, 1999, before Interwoven's initial public offering, the options were subject to a reverse (two-for-three) split, so I actually had fewer options; I had 6[,]666 options as of the end of October 1999. The company then went public, and thereafter, both the stock and the options split twice, in July 2000 and January 2001.
14. On April 14, 2000, Interwoven granted me another 2,000 options (this was entitled Grant Number 990287). Those options were also subject to the splits in July 2000 and January 2001; I thus ended up with 8,000 options as a result of the second grant. These 8,000 options vest at a rate of 25% a year, commencing on the first anniversary (April 14, 2001) of the grant date (April 2000). As of today, thus, 34,664 options have been granted to me (through the two option awards and the splits of those two awards).
15. There have, thus, only been two awards of Interwoven options (ISOs) in the more than 2 years I have been employed there and no award since April 2000! That there have been splits of those options is not tantamount to further awards of options. More significantly, I have only exercised my Interwoven options on a single occasion  in December 2000! I exercised 7,778 vested options in December 2000, and sold the stock as detailed in ¶ 12 above. 17,775 options of those remaining are unvested. (Footnote omitted.)
In response, plaintiff certified that the PSA's reference to W-2 income established the parties' intent for the PSA to use the federal tax-law definition of "income," which (as we will hereafter develop) often requires recognizing a stock option as income when it is exercised. She believed that they mutually understood "gross earned income" to encompass all compensation from any business, regardless of how it was allocated between salary and stock options or between taxable and tax-deferred income. She contended that the exclusion of stock options from the definition of income would have allowed defendant to "manipulate" his compensation package simply by persuading his employer to allocate less of his compensation to salary or commissions and more to stock options, and by deferring their exercise "until our children are no longer dependent on us."
On August 12, 2002, Judge Stephan C. Hansbury granted defendant's initial motion and held that the PSA's definition of "gross earned income" did not include the Interwoven stock options or proceeds from their sale. The judge ruled:
In this case, there is no evidence submitted by the parties that these stock options are consistent, recurring and a substantial part of defendant's regular income. The Court is also satisfied that the stock options are not required to meet the $2[,]500 per month lifestyle. Plaintiff has failed to establish, based upon the information submitted to the Court, that the stock options are provided as a means of compensating defendant in the regular, normal course of employment in lieu of salary and bonus. The Court also concludes that there is no guarantee the stock options will continue.
It is also noted that Section 2.7 of the Property Settlement Agreement defines gross earned income as "all gross wages, commissions, salaries, bonuses and income from bonuses." Elsewhere in the Agreement stock options are mentioned. The specific phrase "stock options" does not appear within the definition "income[.]" Therefore, the Court concludes that this is an intentional omission and that the parties did not intend that stock options be included with gross *1003 income. In any event, from the facts submitted, the Court is satisfied that the stock options provided for the defendant are not appropriately considered income for the purposes of support. No distinction by the Court is made as to whether the options are vested or unvested, cashed in or retained. The fundamental principle is that they are not income as the Court concludes nor is it "gross earned income" as defined by the Property Settlement Agreement.
However, the court held that "the additional child support" provision of the PSA was enforceable and that defendant owed additional support for the year 2000 based on income independent of the exercise and sale of stock options.
We first address whether the post-divorce grant of stock options, or their exercise or sale, constitute "gross income" under New Jersey law. We then consider the impact of the parties' PSA with respect to its inclusion in defendant's child support obligation. We conclude that, absent the PSA, sale of the stock would be part of "gross income" in these circumstances, but agree with Judge Hansbury that the parties' PSA precludes its inclusion as part of his "gross income" for child support purposes.

II.
Plaintiff claims that "the lower court erred in excluding the defendant's Interwoven stock options from the calculation of the defendant's gross income for purposes of child support" and that "the defendant's Interwoven stock options should be included in the defendant's income in the year in which the options vest, or at minimum, upon his actual exercise of the options." Defendant counters that "stock options are assets  and are not treated as income  under the case law of New Jersey" and that "other jurisdictions have treated options as income only when options are regularly awarded and form a significant part of a litigant's compensation."
As previously noted, in his certification "in support of motion for adjudication regarding defendant's stock options," defendant chronicled his employment history during the course of the marriage and stated that over the course of the six positions that he held during the twelve-year marriage, his income would "frequently and unpredictably fluctuate[ ]," due to his position as a commission-based computer software sales person. According to defendant, "neither during my marriage to plaintiff, nor since," did his income include "a regular stream of stock options, or a regular pattern of stock option exercises." Defendant further certified that, after his divorce, he received no stock options awards until he began employment at FirstSense, Inc. in late 1998, when he "was awarded unvested options upon commencing employment." Defendant stated that "[t]hese options never vested, were never exercised, and were forfeited when [he] resigned from FirstSense, Inc. in September 1999."
When defendant began his employment at Interwoven in September 1999, he was granted 10,000 options, which were "scheduled to vest over a period of four years." In his reply certification, responding to plaintiff's allegations that he had "negotiated" to receive compensation through stock options, defendant asserted that he executed the form employment agreement "Interwoven presented to [him]," and that "[t]he options were worthless" at the time he entered into the employment agreement as the company had not yet gone public. Defendant also stated that he received an additional 2,000 stock options on April 14, 2000 and with the various "splits" of the stock, as of the date of his certification, he had been awarded a total of 36,664 stock options. Defendant *1004 exercised 7,778 of his vested stock options in December 2000. Finally, defendant also certified that, while he had purchased Interwoven stock pursuant to the company's "Employee Stock Purchase Plan," he has sold the stock purchased under the plan and does not currently own any stock purchased under the purchase plan.
In Pascale v. Pascale, supra, 140 N.J. at 607-11, 660 A.2d at 497-99, our Supreme Court held that stock options acquired approximately ten days after the filing for divorce, but earned while employed during the marriage, are subject to equitable distribution. The Court focused on "whether the nature of the asset is one that is the result of efforts put forth `during the marriage' by the spouses jointly, making it subject to equitable distribution." Id. at 609, 660 A.2d at 498. The Court stated that to refute a presumption of equitable distribution, "the party seeking exclusion of the asset must bear `the burden of establishing such immunity [from equitable distribution] as to any particular asset.'" Id. (quoting Landwehr v. Landwehr, 111 N.J. 491, 504, 545 A.2d 738, 744 (1988)). The Court concluded that "stock options awarded after the marriage has terminated but obtained as a result of efforts expended during the marriage should be subject to equitable distribution." Id. at 610, 660 A.2d at 498. Subsequently, in Elkin v. Sabo, 310 N.J.Super. 462, 471-73, 708 A.2d 1225, 1229-30 (App.Div.1998), we remanded to determine whether the benefits of a spouse's Employee Stock Option Plan were obtained as a result of efforts expended during marriage and, therefore, subject to equitable distribution. We also held, in Reinbold v. Reinbold, 311 N.J.Super. 460, 469-72, 710 A.2d 556, 561-63 (App.Div.1998), that portions of a retirement incentive package offered after the divorce were based on pre-complaint efforts and subject to equitable distribution.
Thus, generally, property qualifies for equitable distribution "when it is `attributable to the expenditure of effort by either spouse' during marriage," Pascale, supra, 140 N.J. at 609, 660 A.2d at 498 (quoting Painter v. Painter, 65 N.J. 196, 214, 320 A.2d 484, 493 (1974)), and "for purposes of the equitable distribution of marital assets, a marriage is deemed to end on the day a valid complaint for divorce is filed that commences a proceeding culminating in a final judgment of divorce." Portner v. Portner, 93 N.J. 215, 225, 460 A.2d 115, 120 (1983).
The majority of jurisdictions, like New Jersey, hold that stock options acquired during marriage are subject to equitable distribution. See generally, Eric Hollowell, Annotation, Divorce and Separation: Treatment of Stock Options for Purposes of Dividing Marital Property, 46 A.L.R.4th 640 (1986 and Supp.); 15A Am. Jur.2d Community Property 43 (2000); 24 Am. Jur.2d Divorce and Separation 516 (1998). However, "[t]he dispositive issue is whether the grant was made in consideration for actions undertaken during the marriage," as opposed to future efforts. Ruberg v. Ruberg, 858 So.2d 1147, 1152-55 (Fla.Dist.Ct.App.2003). See also In re Marriage of Miller, 915 P.2d 1314, 1319 (Colo.1996) ("an employee stock option granted in consideration of future services does not constitute marital property until the employee has performed those future services").
On the other hand, post-judgment stock options obtained after the divorce are generally includable as income when they are exercised and the stock is actually purchased at the option price, and certainly when it is sold at a profit. See State ex rel. Dep't of Health and Human Res. v. Baker, 210 W.Va. 213, 557 S.E.2d 267, 270-71 (2001); In re Dolan, 147 N.H. 218, 786 A.2d 820, 823-24 (2001) (rehearing *1005 denied, January 9, 2002); In re Marriage of Cheriton, 111 Cal.Rptr.2d 755, 768-70, 92 Cal.App. 4th 269, 288 (2001); In re Marriage of Kerr, 91 Cal.Rptr.2d 374, 380-81, 77 Cal.App. 4th 87, 95-97 (Cal.Ct.App.1999); In re Marriage of Campbell, 905 P.2d 19, 20-21 (Col.Ct.App.1995); Kenton v. Kenton, 571 A.2d 778, 782-83 (Del.1990) (decided under relevant state statute defining "income" or "income" for purposes of child support). However, if an option does not have a readily ascertainable fair-market value when received or exercised, the employee recognizes income, for federal tax purposes, only upon sale of the stock in the amount by which the proceeds exceed the option price. Cramer v. Commissioner, 64 F.3d 1406, 1411-14 (9th Cir.1995), cert. denied, 517 U.S. 1244, 116 S.Ct. 2499, 135 L.Ed.2d 190 (1996); Pagel, Inc. v. Commissioner, 905 F.2d 1190, 1191-92 (8th Cir.1990).
New Jersey statutes require determinations of child support to be based on "[a]ll sources of income and assets of each parent," N.J.S.A. 2A:34-23a(3), and we have held that child support is to be based on the earning capacity that can be imputed to the parents rather than solely on "his or her actual" income. Halliwell v. Halliwell, 326 N.J.Super. 442, 448, 741 A.2d 638, 641 (App.Div.1999). In addition, courts must apply the child-support guidelines ("the guidelines"). R. 5:6A; Koelble v. Koelble, 261 N.J.Super. 190, 194, 618 A.2d 377, 379-80 (App.Div.1992). A court may depart from the guidelines "only where good cause" is shown, coupled with a finding that "injustice would result from" their application. The determination of "good cause" is subject to the court's "sound discretion." R. 5:6A. See also Pressler, Current N.J. Court Rules, App. IX-A ("Considerations in the Use of Child Support Guidelines").
The guidelines define "gross income" as "all earned and unearned income that is recurring or will increase the income available to the recipient over an extended period of time." Pressler, Current N.J. Court Rules, App. IX-B at 2432 (2004). They do not explicitly include stock options in any discussion of income, although they note that the sources of income are "not limited" to the ones listed. Ibid. Included in "gross income" are "compensation for services, including wages, fees, tips, and commissions"; "bonuses and royalties"; "profit sharing plans"; and the "sale of investments (net capital gain) or earnings from investments." Id. at 2432-33. See also id., App. IX-A § 11 at 2416 ("defining income"). The guidelines also provide for imputing income to a parent who is "without just cause, voluntarily underemployed or unemployed" based on his or her "potential employment and earning capacity" based on work history and experience, qualifications, and "prevailing job opportunities in the region." Id., App. IX-A § 12 at 2416. The list of items that the guidelines exclude from "gross income" includes "non-income producing assets (e.g., undeveloped real estate, automobiles, jewelry, art, stocks and bonds) unless the court finds that the intent of the investment was to avoid the payment of child support." Id., App. IX-B at 2434-35.
Plaintiff argues that stock options may be "imputed" as income and cites three cases that hold stock options were includable as income upon the vesting of the right to exercise them. These cases rested on the fact that the grant of stock options was a "significant," "recurring" or "integral" part of the employee's annual income, that the law of the relevant states allowed income to be imputed from investments, or both. MacKinley v. Messerschmidt, 814 A.2d 680, 681-84 (Pa.Super.Ct.2002); In re Marriage of Robinson and Thiel, 201 Ariz. 328, 35 P.3d 89, 92-94 (Ct.App.2001); Murray v. Murray, 128 *1006 Ohio App.3d 662, 716 N.E.2d 288, 292-95, appeal not allowed, 85 Ohio St.3d 1499, 710 N.E.2d 718 (1999). However, our child support guidelines expressly exclude stocks and bonds from income unless the court finds that they were purchased with an intent "to avoid the payment of child support," Pressler, Current N.J. Court Rules, App. IX-B at 2434-35 (2004) ("Types of Income Excluded from Gross Income"), for which there was no evidence in this record. Moreover, as already noted, the guidelines define "gross income" for child support purposes as including "earned or unearned income that is recurring or will increase the income available to the recipient over an extended period of time." Id. at 2435.
The record here does not suggest that the grant of Interwoven stock options to defendant was recurring or otherwise created a resource that defendant could utilize without sale at a profit above the option price. Moreover, there was no evidence to suggest that the court exceeded its discretion under R. 5:6A by failing to find that including those stock options in income upon vesting was necessary to avoid the "injustice" that is required for a departure from the guidelines.
Accordingly, we conclude that the ability to exercise stock options does not by itself give rise to "income" for purposes of defendant's child support obligation, but that the actual exercise of the options may give rise to income if there is a demonstrated fair market value of the stock above the option price. In essence, plaintiff is correct that the exercise of a stock option may constitute "income" in New Jersey, and, in any event, that the profitable sale of stock after exercise of the options certainly constitutes "income."
The question then becomes whether the motion judge erred by failing to rule that the Interwoven stock options were to be included in defendant's income for the year 2000 during which defendant exercised a portion of his options and to the extent of his profit on the sale of the stock.

III.
The PSA expressly contemplated the distribution of stock options existing at the time of divorce. The parties' stocks and options were listed in paragraphs 1.2 and 1.25. Paragraph 1.26 provided that:
The parties agree that the Wife shall be entitled to retain all [of] the IBM stock and the Husband shall be entitled to retain his options [from Platinum Technology.] Each party will sign whatever documents are necessary to effectuate the transfers.
Paragraph 1.27 further contemplated that all stocks and stock options acquired during the marriage were accounted for in the PSA:
The parties each acknowledge that all stock, stock options and brokerage and/or all other accounts maintained by him or her or on his or her behalf are set forth herein.
Moreover, the PSA memorialized in paragraph 9.4 the parties' intentions that subsequently acquired property be free from claim by the other party:
All property and money received and retained by the parties pursuant to this Agreement shall be the separate property of the respective party, free and clear of any right, interest or claim of the other party and each party shall have the right to deal with, and dispose of, his or her separate property, both real and personal, now owned or hereafter separately acquired as fully and effectively as if the parties had never been married. Except as herein otherwise provided, each party may dispose of his or her property in any way and each party hereby waives and relinquishes any and all rights he or she may now have or *1007 hereafter acquire under the present or future laws of [ ] any jurisdiction, to share in the property or estate of the other as a result of the marital relationship....
As noted at the outset, paragraph 2.2 of the PSA set forth that plaintiff was entitled to $2,500 per month in child support from defendant, based upon defendant's estimated income in 1997 being $180,000. Paragraph 2.3 elaborated that "[i]n addition to the child support in paragraph 2.2, the Husband shall pay the Wife child support of 11.6% of his gross income over $180,000 per year." More specifically, for each year defendant's gross salary exceeds $180,000, "he shall pay the base support set forth in paragraph 2.2 plus 11.6 cents for each $1.00 ($11.60 per $100.00) his gross income exceeds $180,000.00." "Gross earned income" was defined in paragraph 2.7 as "all gross wages, commissions, salaries, bonuses and income from businesses." The PSA also provided in paragraph 1.31 that "[e]ach party waives and relinquishes all right, title and interest in and to any benefits under any past, current or future profit sharing, pension or retirement plan of the other ..."
The motion judge found that, as "[t]he specific phrase `stock options' does not appear within the definition `income,' "it was "an intentional omission and that the parties did not intend that stock options be included with gross income." The judge therefore concluded that "the stock options provided for the defendant are not appropriately considered income for the purposes of support."
The issue before us is one of contract interpretation, and there is no material factual dispute warranting a plenary hearing.
We agree with the motion judge that the PSA did not include these post-divorce stock options within the definition of gross income for the purposes of calculating child support. The stock options in question were acquired by defendant in September 1999, approximately two years after execution of the PSA, and thereafter. Here, stock options were addressed by a provision of the PSA which provided that pre-divorce options would be retained by the spouse whose employer provided the option. The express exclusion of such options from equitable distribution, combined with the lack of reference to post-divorce options, while providing that property acquired in the future would remain free from claim by the other party, supports the motion judge's conclusion that the PSA intended that future stock options were not to be included in gross income. Accordingly, we hold that the exercise and sale of the post-divorce after-acquired stock options in question does not constitute "income" under the PSA for purposes of child support.

IV.
On his cross-appeal, defendant claims that the court erred by failing to modify the PSA to eliminate his obligation to pay the additional child support due to changed circumstances based on his remarriage and new family, and because the children from his first marriage will continue to receive ample support.
We summarily reject this contention, and affirm defendant's obligation to pay additional child support for the year 2000 based on the motion judge's finding that, even "without considering stock options," defendant's income had increased significantly, reaching $325,450. While a PSA is "subject to amendment by the court when changed circumstances make its enforcement inequitable," Brawer v. Brawer, 329 N.J.Super. 273, 284, 747 A.2d 790, 796 (App.Div.), certif. denied, 165 N.J. 138, 754 A.2d 1214 (2000) (citing Lepis v. Lepis, 83 N.J. 139, 148-49, 416 A.2d 45, 49-50 (1980)), there is no suggestion that the *1008 counseled PSA in this case is not fair and just or that there is a basis to deprive the children of the benefits of their father's financial achievement. See Patetta v. Patetta, 358 N.J.Super. 90, 95, 817 A.2d 327, 330-31 (App.Div.2003); Hudson v. Hudson, 315 N.J.Super. 577, 583, 719 A.2d 211, 214 (App.Div.1998). See also Loro v. Colliano, 354 N.J.Super. 212, 219-23, 806 A.2d 799, 803-06 (App.Div.), certif. denied, 174 N.J. 544, 810 A.2d 64 (2002); Isaacson v. Isaacson, 348 N.J.Super. 560, 569, 579-83, 792 A.2d 525, 530-31, 537-39 (App.Div.), certif. denied, 174 N.J. 364, 807 A.2d 195 (2002); Koelble v. Koelble, supra, 261 N.J.Super. at 192-94, 618 A.2d at 378-80. Moreover, defendant advances no factual contention that his income in the year 2000 did not exceed $180,000 or was the subject of erroneous fact-finding.

V.
The judgment is in all respects affirmed.
NOTES
[1] Due to a decline in defendant's income, in November 1999 the court temporarily reduced defendant's monthly child-support obligation to $1,300. After defendant's income recovered, he resumed paying child support in the original monthly amount, and an order to that effect was entered on November 7, 2001.