RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-3532-14T3

K.C.,

 Plaintiff-Respondent,

v.

D.C.,

 Defendant-Appellant.

____________________________________

 Argued April 25, 2017 – Decided September 29, 2017

 Before Judges Espinosa, Suter and Grall.

 On appeal from Superior Court of New Jersey,
 Chancery Division, Family Part, Monmouth
 County, Docket No. FM-13-1782-11.

 Randy J. Perlmutter argued the cause for
 appellant (Kantrowitz, Goldhamer & Graifman,
 PC, attorneys; Mr. Perlmutter and William T.
 Schiffman, on the brief).

 Megan S. Murray argued the cause for
 respondent (Law Offices of Paone, Zaleski,
 Brown & Murray, attorneys; Ms. Murray, of
 counsel and on the brief).

PER CURIAM
 Defendant appeals from a judgment entered following a trial

in this matrimonial matter, challenging the alimony award, aspects

of the trial court's decision on equitable distribution, and the

court's appointment of a mediator and allocation of his fees. We

affirm in part and reverse in part.

 I.

 The parties were married in 1996; the complaint for divorce

was filed fifteen years later in 2011. Plaintiff, a college

graduate, left the workforce shortly before the first of their two

children was born in 1997. She did not work outside the home

thereafter. Defendant was employed as a consultant and reported

the following income on his tax returns for the year the complaint

was filed and the three previous years: $521,526 (2008), $575,151

(2009), $608,932 (2010) and $371,927 (2011).

 II.

 The "factual findings and legal conclusions of [a] trial

judge" in a non-jury case should not be disturbed unless they are

"so manifestly unsupported by or inconsistent with the competent,

relevant and reasonably credible evidence as to offend the

interests of justice." Rova Farms Resort, Inc. v. Investors Ins.

Co., 65 N.J. 474, 484 (1974). Deference to a court's factual

findings "is especially appropriate when the evidence is largely

testimonial and involves questions of credibility." Cesare v.

 2 A-3532-14T3
Cesare, 154 N.J. 394, 412 (1998). In particular, the courts have

"emphasize[d] the narrow contours of appellate review pertaining

to the division of marital assets," and have "'rel[ied]

heavily . . . on the discretion of the trial judge in making these

delicate and difficult judgments.'" Wadlow v. Wadlow, 200 N.J.

Super. 372, 377 (App. Div. 1985) (quoting Gibbons v. Gibbons, 174

N.J. Super. 107, 114 (App. Div. 1980)).

 III.

 In Point I, defendant argues the trial court erred in awarding

plaintiff one-half of a "one-time celebratory grant" of 14,492

restricted share units (RSUs) awarded to him on January 1, 2011,

four months before the complaint for divorce was filed.

 Citing Elkin v. Sabo, 310 N.J. Super. 462, 472-73 (App. Div.

1998), defendant argues the record is unclear as to whether the

RSUs were granted as a reward for past performance or as an

incentive for future performance and that the matter must be

remanded for a further determination by the court. We disagree.

 In 2010, defendant received a promotion from his employer,

Accenture LLP, that included a higher salary and a grant of 14,492

RSUs, effective January 1, 2011, pursuant to a Standard Form of

Celebratory Restricted Share Unit Agreement for fiscal year 2011

that vested pursuant to a schedule over the period from 2011 to

2017.

 3 A-3532-14T3
 "Property 'clearly qualifies for distribution' when it is

'attributable to the expenditure of effort by either spouse' during

marriage." Pascale v. Pascale, 140 N.J. 583, 609 (1995) (quoting

Painter v. Painter, 65 N.J. 196, 214 (1974)). Even when property

is acquired after a complaint for divorce is filed, it is

"normally" subject to equitable distribution if it is "a reward

for or a result of efforts expended during the marriage." Id. at

612. "The majority of jurisdictions, like New Jersey, hold that

stock options acquired during marriage are subject to equitable

distribution." Heller-Loren v. Apuzzio, 371 N.J. Super. 518, 530

(App. Div. 2004). As with any other property at issue in a divorce

proceeding, the dispositive question is whether the stock options

were granted "in consideration for actions undertaken during the

marriage." Ibid. The burden of establishing the immunity of any

given property from equitable distribution lies with the party

seeking exclusion. Pascale, supra, 140 N.J. at 609.

 Defendant, who was self-represented at trial, relied upon his

own testimony to establish that the RSUs were immune from equitable

distribution. He argued the RSUs were granted to him as a

guarantee of his future good performance, and therefore, any RSUs

that vested after divorce proceedings began were not marital

property subject to equitable distribution. The court allowed

 4 A-3532-14T3
defendant additional time after trial to provide evidence in

support of his theory, but he did not do so.

 The trial court found the RSUs awarded in January 2011 were

"subject to equitable distribution and shall be equally divided,"

observing defendant provided no evidence to support his theory

that the award was for future performance. The court noted the

RSUs may not be transferable outright to Wife as a non-employee

of Accenture, and therefore ordered defendant to establish a trust

to transfer the value of the RSUs as they vest. Specifically, the

court stated that defendant

 shall monetize [Wife's] 50% interest in the
 vesting RSUs within fourteen (14) days of a
 vesting event. [Defendant] shall
 automatically sell [Wife's] shares and pay
 100% of the proceeds to [Wife], less any
 amount withheld by [Defendant's] employer for
 tax purposes.

 Not only did defendant fail to support his characterization

of the RSUs with any documentary evidence, the evidence before the

court supported the conclusion that the RSUs were awarded for

performance during the marriage.

 Accenture's compensation overview states that RSU grants are

awarded in recognition of high-ranking employees' efforts, and

does not mention their use as a guarantee for future performance.

In a letter to plaintiff's attorney, Accenture stated that RSU

grants of the type at issue are awarded annually "based on level

 5 A-3532-14T3
of responsibility and individual performance rating" at the time

of the grant. To be eligible for such a grant, the employee must

be rated "'Above' or higher." The stated purpose of the Accenture

PLC 2010 Share Incentive Plan is

 to aid the Company . . . in recruiting,
 retaining and rewarding key employees . . . of
 outstanding ability and to motivate such
 employees . . . to exert their best
 efforts . . . by providing incentives through
 the granting of Awards. The Company expects
 that it will benefit from the added interest
 which such key employees . . . will have in
 the welfare of the Company as a result of their
 proprietary interest in the Company.

 Aside from the generalized aspiration that "key employees"

who are granted RSUs will have an enhanced interest in the welfare

of Accenture, there is no requirement that the employee meet any

performance goals before a batch of RSUs will vest pursuant to the

schedule. The only condition for vesting is "continued

employment." Moreover, in the event the employee is no longer

employed due to death or disability, all of the RSUs granted,

whether vested or not, are transferred to the employee or his

estate. Obviously, the transfer of RSUs following death or

disability would not be based on future performance.

 6 A-3532-14T3
 In sum, all the documentary evidence in the record1 states

that such promotional grants are awarded based on performance

ratings at the time of the award, in recognition of employees'

efforts, and no document provided to the court states defendant

must meet any given performance goal to trigger the vesting of

RSUs that are part of the grant. Contrary to defendant's argument,

the record was clear, and fully supported the trial court's

determination that the RSUs were subject to equitable

distribution.

 IV.

 The other equitable distribution decision challenged by

defendant concerns a ski home the parties purchased in 2004, with

defendant's brother and sister-in-law, John and Ruth Ann Cowles

(the Windham House). All four family members were listed on the

home's deed as tenants in common. Plaintiff testified all four

intended to be equal owners. Defendant argued that John and Ruth

Ann owned a greater share in the property than plaintiff and

defendant, and therefore, plaintiff should not receive a twenty-

five percent share as part of the equitable distribution. No

1
 The court-appointed economic expert, also testified that based
upon the documentation he had reviewed, the RSUs were "awarded for
service provided".

 7 A-3532-14T3
document was produced to show that ownership was other than equal

among the four owners.

 The trial court awarded a one-fourth share of the value of

the Windham House to plaintiff as equitable distribution.

Defendant argues the trial court erred in doing so and in

improperly ignoring evidence that the purchase was a joint venture.

He contends the matter should be remanded to the trial court for

proper consideration of the issue. We disagree.

 First of all, we note that defendant did not argue at trial

that the house was a "joint venture." He argued simply that the

two families owned it on an unequal basis and put differing amounts

of money into its maintenance.

 Under New York law, "[a] joint-venture agreement is generally

defined as a special combination of two or more persons wherein

some specific venture profit is jointly sought without any actual

partnership or corporate design." Ackerman v. Landes, 112 A.D.2d

1081, 1082 (N.Y. App. Div. 2d Dep't 1985) (citation and internal

quotation marks omitted). The "essential elements" of such an

undertaking are:

 an agreement manifesting the intent of the
 parties to be associated as joint venturers,
 a contribution by the coventurers to the joint
 undertaking (i.e., a combination of property,
 financial resources, effort, skill or
 knowledge), some degree of joint
 proprietorship and control over the

 8 A-3532-14T3
 enterprise, and a provision for the sharing
 of profits and losses.

 [Ibid.]

 No agreement was presented that satisfied these elements.

Further, there does not appear to have been any "sharing of profits

and losses" related to the house, or in fact any "profits" at all

related to its ownership, since it was apparently used by the

families solely as a personal ski house and sometimes a place to

entertain guests.

 Moreover, as described by defendant and his brother, their

agreement entailed ongoing contributions to the expenses of the

house, that would neither be performed within one year nor

completed before the end of a lifetime. As a result, the agreement

was void under New York law unless in writing. N.Y. Gen. Oblig.

Law § 5-701 (Consol. 2017).

 Defendant contends there was ample testimony to prove the

existence of a joint venture. First, he cited the undisputed fact

that John and Ruth Ann contributed $50,000 more than the parties

to the $350,000 purchase of the house. Both defendant and his

brother testified there was an annual accounting of expenses that

demonstrated John and Ruth Ann continued to contribute more to

 9 A-3532-14T3
expenses.2 However, this document could not be authenticated and

was never produced by defendant in response to discovery requests.

 John testified the parties owned a smaller percentage in the

home and that defendant and their father also owned a share in the

house based on "sweat equity." He acknowledged, however, that the

deed reflected equal ownership and would control in the event of

the death of any of the four owners. He also conceded the parties

had never created any written agreement stating the way in which

the four owners paid for the house's expenses would result in

unequal ownership interests.

 What was entirely lacking from the testimony was any

suggestion the parties intended to form an "enterprise" of any

kind or that there was a "provision for the sharing of profits and

losses." Ackerman, supra, 112 A.D.2d at 1082. The house was

purchased and used as a private family ski vacation home.

 In its decision, the trial court noted the deed stated the

property was purchased by defendant, plaintiff, John and Ruth-Ann

Cowles as "tenants in common," and that defendant had "provided

no evidence that the parties were anything but tenants in common

with his brother and sister-in-law." It found that under New York

2
 Plaintiff disputed this, testifying that bills for the Windham
House were paid equally by the parties, and John and Ruth Ann had
an annual expense spreadsheet prepared to insure their
contributions to expenses were equal.

 10 A-3532-14T3
law, which governed the issue, a tenancy in common involves an

interest in property held by two or more persons in which no right

of survivorship exists. The court concluded defendant and

plaintiff together owned a fifty percent interest in the Windham

House. It ordered defendant to pay plaintiff $113,750 representing

her half of that fifty-percent share,3 and ordered plaintiff to

transfer her interest to defendant in exchange.

 The court found, based upon the evidence before it, namely

the deed and the testimony given by plaintiff and John Cowles,

that the Windham House was owned equally by all four family

members. That the court apparently found plaintiff's testimony

and the text of the deed more credible than defendant's brother,

and thus gave those sources more weight in its decision, does not

render its decision erroneous. We concur with the trial court's

application of New York law to the facts here. As to defendant's

argument that the trial court erred in excluding evidence that he

now claims supported his characterization of the ownership as a

joint venture, we note that our review of evidentiary rulings is

governed by an abuse of discretion standard. See, State v. E.B.,

348 N.J. Super. 336, 344-345 (App. Div. 2002). We discern no

abuse of discretion in the court's ruling.

3
 The parties stipulated that the value of the Windham house is
$455,000.

 11 A-3532-14T3
 V.

 Defendant claims the trial court made multiple errors in

making its determination regarding alimony. We find merit in two

of his arguments, requiring a remand.

 "A Family Part judge has broad discretion in setting an

alimony award." Clark v. Clark, 429 N.J. Super. 61, 71 (App. Div.

2012). An appellate court will "give deference to a trial judge's

findings as to issues of alimony, if those findings are supported

by substantial credible evidence in the record as a whole." Reid

v. Reid, 310 N.J. Super. 12, 22 (App. Div.), certif. denied, 154

N.J. 608 (1998).

 A.

 In arriving at the alimony award, the court first considered

the statutory factors set forth in N.J.S.A. 2A:34-23(b).

 The court found plaintiff was forty-four years old, had a

college degree but had not worked outside the home for fourteen

years, rejecting defendant's contention to the contrary. The

court imputed annual income to her of $35,000 and an additional

$40,000 in investment income. The court found defendant earned

over $400,000 in 2013 and would earn at least as much in 2014.

 As to the standard of living in the marriage, the court found:

 The parties had a joint marital lifestyle that
 required them to spend about $19,000 on
 expenses and save about $9,000, for a total

 12 A-3532-14T3
 of $28,000 a month. It is unlikely that they
 will both be able to maintain the joint
 marital lifestyle. To do so, they would need
 combined net income of about $672,000 a year,
 or in excess of $800,000 gross a year.

While defendant could be expected to earn approximately $400,000,

plaintiff's earning capacity is far more limited. Moreover,

plaintiff did not express any "desire to be self-sufficient or

contribute to her support in any meaningful way."

 The trial court found plaintiff was and remained the primary

caretaker for the children, making "significant non-financial

contributions" but not working outside the home after their first

child was born. The court also noted the children were now

teenagers attending school full-time, posing no impediment to

plaintiff obtaining full-time employment.

 As to equitable distribution and income from other assets,

the trial court observed the parties would share property valued

in excess of $3.5 million. The court estimated that approximately

$2 million of that amount represented the value of RSUs, bank and

brokerage accounts.

 The trial court concluded the parties "will need to reduce

expenses and cannot each afford to live a lifestyle that would

require them to spend $19,000 and save $9,000 a month." Alimony

was awarded as follows:

 13 A-3532-14T3
 Alimony shall be paid at an annual rate of
 $100,000, based on Plaintiff's imputed income
 of $75,000 ($35,000 income and $40,000 in
 investment income) and Defendant's income of
 $352,000 (base salary of $312,000 a year plus
 $40,000 imputed for investment income). In
 addition, Defendant shall pay "additional
 alimony" of 33% of his total compensation from
 all sources, over and above his base salary.
 Defendant shall not be required to pay alimony
 on income in excess [of] $672,000 (after-tax)
 as this is the amount that would permit both
 parties to maintain the joint marital
 lifestyle. No evidence was presented
 regarding any rental income received by
 Defendant.

 Defendant was required to provide plaintiff with

documentation of his income by February 1 of each year, "including

copies of his previous year's W-2s, year-end pay stubs, and any

documentation reflecting any compensation received from any source

received during the prior calendar year."

 B.

 Defendant challenges the court's order that he pay additional

alimony of "33% of his total compensation from all sources, over

and above his base salary." (emphasis added). He asserts the RSUs

granted to him in 2011, batches of which vest each year, should

not be considered "income" for alimony purposes because half of

the RSUs must be transferred to plaintiff upon vesting as part of

equitable distribution. He cites Innes v. Innes, 117 N.J. 496

(1989), for the proposition that this is "double-dipping."

 14 A-3532-14T3
 Throughout the proceedings, plaintiff contended any RSUs

granted during the marriage were subject to equitable

distribution, but that RSUs granted after the marriage would be

"considered as income to defendant as they vest" for purposes of

calculating alimony. In summation, plaintiff's counsel presented

her request for alimony as follows:

 Moreover, assuming the Wife receives equitable
 distribution of all RSUs granted to the
 Husband prior to the date of Complaint (May
 6, 2011), the Wife should not be entitled to
 share in, for alimony purposes, any equity
 compensation earned by the Husband as the
 result of the vesting of these pre-Complaint
 RSUs. Rather, the Wife should receive as and
 for alimony 33% gross of any post-Complaint
 equity compensation earned by the Husband as
 the result of the vesting of RSUs received by
 the Husband after May 6, 2011.

 The court did not specifically state in its opinion that the

value of the RSUs that vest each year will be excluded from

consideration when calculating defendant's "compensation from all

sources." However, the order does formalize the distinction

between pre- and post-divorce grants of RSUs by stating the former

must be equally divided between the parties as they vest while the

latter will be retained by defendant. A reasonable interpretation

of the trial court's decision, which adopts much of plaintiff's

proposal and language concerning alimony, is that the court ruled

that the RSUs granted in 2011 were marital property subject to

 15 A-3532-14T3
equitable distribution, and only the RSUs awarded after the

marriage will be considered income for alimony purposes. In light

of the fact that defendant's alimony obligation continues for

twelve more years, we conclude that this issue is best remanded

to the trial court for clarification, as discussed further

regarding the next issue raised.

 C.

 Defendant also challenges the methodology the trial court

applied to the additional alimony award. Without citing any

binding precedent, he contends the percentage formula used by the

court is not "permissible."4 We discern no error in the use of a

percentage to calculate additional alimony.

 However, as we have noted, the term "all sources" would

benefit from clarification. In addition, we find merit in

defendant's challenge to the cap used by the court for additional

alimony. The trial court defined the cap as follows: "Defendant

shall not be required to pay alimony on income in excess [of]

$672,000 (after-tax) as this is the amount that would permit both

parties to maintain the joint marital lifestyle." The only other

4
 We note the unpublished opinion relied upon by defendant is
distinguishable as it concerned the modification of support
obligations without making "crucial factual determinations." As
we have noted, the trial court made appropriate factual findings
pursuant to N.J.S.A. 2A:34-23(b) as part of its alimony award
determination.

 16 A-3532-14T3
reference to $672,000 in the trial court's opinion is contained

in its earlier assessment of the amount the parties needed to

finance their joint marital lifestyle and the court's

extrapolation that the expenses would be exactly double to maintain

that lifestyle separately. The court noted this would require

"combined net income of about $672,000" and a gross income in

excess of $800,000.

 As defendant asserts, he has never earned more than $600,000

pre-tax in any given year. In effect, then, the cap set by the

trial court is no cap at all and is not tethered to a determination

of what is needed to maintain a lifestyle enjoyed during the

marriage, giving due consideration to defendant's earning

capacity. Accordingly, we remand to the trial court to define

what is meant by "all sources" subject to the additional alimony

calculation, to establish the cap for income subject to additional

alimony calculation, to explain the basis for the 33% formula and

to set forth reasons for those decisions. Our remand is not

intended to preclude the judge from considering whether a formula

for an automatic adjustment is a preferred approach over leaving

any such adjustment an open question subject to review pursuant

to Lepis v. Lepis, 83 N.J. 139 (1980) and Crews v. Crews, 164 N.J.

11 (2000) on a showing of changed circumstances.

 17 A-3532-14T3
 D.

 Defendant's remaining arguments regarding alimony lack merit.

 In challenging the trial court's finding regarding his

income, defendant argues he does not receive all income from his

vesting shares because he does not cash them in. This argument

is refuted by his own concession that the RSUs appear on his W-2

tax forms as income in the years in which they vest. He also

contends the court should have used an average of several years

to determine his income because he was no longer eligible to

receive the additional compensation that led to his earning as

much as $608,932 in 2010. This argument fails because the trial

court relied upon defendant's known earnings at the time of the

trial.

 Defendant also argues the court erred in ignoring the fact

the parties saved significant money because he intended to retire

at fifty years of age and in failing to take the amount of equitable

distribution into consideration in determining the amount of

alimony. These challenges lack merit. The court's statement of

reasons makes repeated references to the equitable distribution

award, imputes income to plaintiff based upon anticipated income

from that award, and acknowledges that the parties saved

aggressively as part of their lifestyle.

 18 A-3532-14T3
 Defendant's challenge to the duration of the alimony award

lacks sufficient merit to warrant discussion, R. 2:11-3(e)(1)(E),

beyond the following brief comments. Defendant contends the trial

court failed to take into account the pendente lite support he

paid to plaintiff pursuant to a consent order. N.J.S.A. 2A:34-23

does not require the length of an alimony period to be reduced by

the number of years the paying party has paid pendente lite

support, and instead states only that the payment of pendente lite

support must be "consider[ed]" when making decisions as to alimony.

The trial court did so here, making note of the pendent lite

support when analyzing the N.J.S.A. 2A:34-23(b) alimony factors,

and also addressing it directly in a section concerning plaintiff's

request for additional support. Additionally, the court did not

base the period of the open durational alimony solely upon the

duration of the parties' marriage. The court stated the alimony

award was appropriate "based upon the statutory factors, including

the length of the marriage, Plaintiff's clear economic dependency,

Plaintiff's responsibility of caring for the children and

diminished earning capacity because of her role as the caretaker

of the family."

 VI.

 After the trial concluded, the court found the parties failed

to provide adequate information regarding defendant's compensation

 19 A-3532-14T3
and appointed an accounting firm to obtain additional information

on that issue and to perform a lifestyle analysis. Robert Brown,

CPA, prepared two expert reports pursuant to this appointment.

After the expert appointment, the parties met with him at the

court's suggestion in an unsuccessful attempt at mediation.

Defendant did not object to Brown's appointment as expert or

service as mediator and, in fact, requested that Brown be recalled

as a witness when additional testimony was taken after the trial

court re-opened the case.

 Defendant now argues the trial court erred in making the

expert appointment after the trial had concluded and that because

Brown had attempted to mediate the matter, he had a conflict that

precluded him testifying as an expert. This argument is wholly

lacking in merit and, because defendant presents it for the first

time on appeal, we need not consider it. US Bank Nat. Ass'n v.

Guillaume, 209 N.J. 449, 483 (2012).

 VII.

 In Point IV, defendant argues the trial court erred in

ordering him to pay the full amount of the fees for a second

parenting coordinator and for Brown's expert fees.

 He argues that burdening him with the entire responsibility

for the fees of the second parenting coordinator was inconsistent

with the court's earlier decision to allocate the fees of the

 20 A-3532-14T3
first parenting coordinator. He also contends the reports prepared

by Brown were "a complete waste of time and money" and complains

the court failed to allocate his fees. Defendant contends that

the failure to allocate fees constituted a gross abuse of

discretion.

 As a preliminary matter, we reject defendant's contention

that the trial court's appointment of Brown was improper. The

court made it clear that an economic expert was necessary due to

defendant's lack of preparation, failure to produce evidence in

support of his claims, and series of inconsistent case information

statements. Under Rule 5:3-3(c), "[w]henever the court concludes

that disposition of an economic issue will be assisted by expert

opinion," it may appoint an expert. Such an expert "may be

selected by the mutual agreement of the parties or independently

by the court." R. 5:3-3(d). When an economic expert is appointed,

Rule 5:3-3(i) provides that "the court may direct who shall pay

the cost of such examination, appraisal, or report."

 The court also had the authority to determine how the expert's

fees would be paid. Under N.J.S.A. 2A:24-23,

 The court may order one party to pay a retainer
 on behalf of the other for expert and legal
 services when the respective financial
 circumstances of the parties make the award
 reasonable and just. In considering an
 application, the court shall review the
 financial capacity of each party to conduct

 21 A-3532-14T3
 the litigation and the criteria for award of
 counsel fees that are then pertinent as set
 forth by court rule.

 Further, under Rule 5:3-5(c), in determining a fee award the

court should consider

 (1) the financial circumstances of the
 parties; (2) the ability of the parties to pay
 their own fees or to contribute to the fees
 of the other party; (3) the reasonableness and
 good faith of the positions advanced by the
 parties both during and prior to trial; (4)
 the extent of the fees incurred by both
 parties; (5) any fees previously awarded; (6)
 the amount of fees previously paid to counsel
 by each party; (7) the results obtained; (8)
 the degree to which fees were incurred to
 enforce existing orders or to compel
 discovery; and (9) any other factor bearing
 on the fairness of an award.

 Here, the parties stipulated that McGoughran should be a

parenting coordinator in the case. During the proceedings,

plaintiff took the position that defendant should pay all fees for

McGoughran, because the coordinator did not accept American

Express cards and so she could not pay him using the card defendant

provided for pendente lite support. The court ordered that

defendant pay McGoughran's fees "subject to reallocation at the

end of this case." In a later stipulation, the parties agreed,

"Judge shall determine allocation of fees." In its final order

of February 13, 2015, the court stated that defendant shall pay

all outstanding fees owed to McGoughran, totally $3,648.05.

 22 A-3532-14T3
 As to Brown, the court noted that defendant could not explain

his compensation structure at Accenture at his deposition and had

suggested "accountants should be retained to figure it out." The

court later reiterated that the reason for its appointment of

Brown was that defendant had "presented proofs that were

unintelligible" on the subjects of the marital lifestyle and his

income.

 The court noted defendant submitted "wildly disparate Case

Information Statements" in an effort to support his "utter

insistence that the parties lived a modest lifestyle." The court

found a review of defendant's case information statements

"illustrate Defendant's total lack of credibility regarding his

testimony on the joint marital lifestyle." For this reason, the

court appointed Brown to perform a lifestyle analysis. Ultimately,

the court found defendant "did not refute the overwhelming majority

of the information included in Mr. Brown's report."

 In general, an "award of counsel [or expert] fees in a

matrimonial case rests in the sound discretion of the trial judge."

Salch v. Salch, 240 N.J. Super. 441, 443 (App. Div. 1990). Thus,

review of a determination as to the allocation of such fees is

"guided by the abuse of discretion standard." Platt v. Platt, 384

N.J. Super. 418, 429 (App. Div. 2006). The court did not make any

explicit findings as to why it allocated all of McGoughran's and

 23 A-3532-14T3
Brown's fees to defendant in its final decision. However, the

economic disparity between the parties that led the court to impose

all of McGoughran's fees on defendant at the outset has continued

post-divorce. In addition, it is evident the assistance of the

economic expert was made necessary by defendant's failure to submit

proofs to support his contentions regarding lifestyle, his

compensation and his characterization of the RSUs. Moreover,

defendant insisted that Brown should be recalled for a second day

of testimony, and then refused to participate in questioning him.

Under these circumstances, we are satisfied that the trial court's

decision to have defendant be responsible for all expert fees was

not an abuse of discretion.

 VIII.

 In light of its award of "open-durational alimony for

fourteen" years, the trial court required defendant to maintain

no less than $1.5 million in term life insurance on his life,

naming plaintiff as beneficiary, until February 28, 2029. The

trial court also imposed a separate life insurance requirement on

both parties that was tied to the children's emancipation. At the

time of judgment in February 2015, the parties' children were

eighteen and fourteen years old. The court ordered, "Based on the

child support award and the age of the minor children, both parties

shall maintain no less than $250,000 in life insurance on their

 24 A-3532-14T3
respective life [sic] naming the children as equal beneficiaries

thereof, until the children are emancipated."

 Defendant argues the court should have provided that he can

reduce his $1.5 million insurance obligation "designed to

initially cover his support obligations as those support

obligations reduce." In the alternative, he states the court

should have provided that if the policy amount exceeds the amount

of support secured at the time of his death, the excess should be

returned to his estate. Defendant cites Konczyk v. Konczyk, 367

N.J. Super. 512 (App. Div. 2004), to support his argument.

 In his argument, defendant does not contend he asked for the

relief he now seeks on appeal. In the absence of a request, he

essentially asks this court to find the trial court erred in

failing to incorporate such a provision sua sponte. Konczyk does

not stand for that proposition. In Konczyk, the husband removed

his former wife as a beneficiary in violation of his alimony

obligation. We affirmed a trial court's decision that the

supported spouse was entitled to the amount of outstanding alimony

and not the full amount of the insurance policy the decedent was

required to maintain. Under the circumstances, we find no reason

to disturb the trial court's decision.

 Affirmed in part, reversed and remanded in part. We do not

retain jurisdiction.

 25 A-3532-14T3